**STATE OF GEORGIA, By and Through the DEPARTMENT OF HUMAN RESOURCES**

v.

**Joseph A. CALIFANO, Jr., in his Official Capacity as Secretary of Health, Education and Welfare.**

**No. C76–543A.**

United States District Court, N. D. Georgia, Atlanta Division.

Dec. 19, 1977.

Arthur Bolton, State's Atty. Gen., Stephen L. Cotter, Asst. Atty. Gen., Atlanta, Ga., for plaintiff.

Carl A. Harper, Regional Atty., Dept. of HEW, William E. Turnipseed, Asst. U. S. Atty., Northern Dist. of Georgia, Atlanta, for defendant.

## ORDER OF COURT

MOYE, District Judge.

This is an action under Title XIX of the Social Security Act of 1935, as amended, 42 U.S.C. § 1396 *et seq.,* and the Administrative Procedure Act, 5 U.S.C. §§ 705 and 706. The case arises from a dispute between the State of Georgia Department of Human Resources (DHR) and the United States Department of Health, Education and Welfare (HEW). The center of the controversy is HEW's refusal to reimburse Georgia for some $3.5 million which was paid by DHR to doctors who had provided services to Georgia Medicaid recipients in the years 1972 through 1975. The case is presently before this Court on cross motions for summary judgment.

### I. *Factual Background*

Pursuant to Title XIX, any state which administers a medical assistance (Medicaid) plan that has been approved by the Secretary of HEW pursuant to the provisions of 42 U.S.C. § 1396a is entitled to federal financial participation in its Medicaid program. This federal financial participation is in the form of a reimbursement for a percentage [1] of the total amounts spent by the state for medical assistance pursuant to the approved state plan. Although such state plans are designed by the state, they must meet certain federal standards in order to receive federal approval and funding. One such standard provides that payments

---

1. This percentage varies among the classes of expenditures and is specifically set forth in 42 U.S.C. § 1396a (a) and (b).

to individuals by the state for Medicaid services are not to exceed the amounts determined by application of the guidelines established by 45 C.F.R. § 250.30.

The architects of Title XIX were aware that many states would be unable to finance the cost of an effective Medicaid program even if the state would ultimately be reimbursed for such costs. To alleviate this problem, Congress provided a program whereby the Secretary of HEW "shall estimate the amount to which a State will be entitled . . ." and then the Secretary "shall pay to the State, in such installments as he may determine, the amount so estimated, reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made under this section to such State for any prior quarter . . ." 42 U.S.C. § 1396b (d)(1), (2).

In January 1973, HEW, through its Social Rehabilitation Services (SRS), which administers the funding to state Medicaid programs, contracted with a public accounting firm to conduct a financial management review of the administration of the Georgia Medicaid program by the Georgia DHR. The purpose of the audit was to review the five-quarter period beginning January 1, 1972, and ending March 30, 1973, in an effort to determine whether any federal funds paid to Georgia had been used for expenses not covered by the Georgia Medicaid plan. The audit was conducted on the basis of random statistical samples of claims paid during the five-quarter period. The audit revealed that Georgia had paid some claims in excess of the ceilings imposed by 45 C.F.R. § 250.30. These claims fell into four areas: drug charges; nursing home reimbursement; inpatient hospital reimbursement; and physician fees. The overpayment of claims by Georgia resulted in an inflated cost of the Medicaid program. As a result the Regional Commissioner of SRS disallowed $2,857,303 in matching federal funds[2] and made a demand for the refund of that money.

Georgia pursued its right to have the disallowance reconsidered by the Administrator of SRS pursuant to 45 C.F.R. 201.14. A final decision was released January 16, 1976. The disputes concerning inpatient hospital reimbursement had been resolved at the regional level. Upon reconsideration, the Administrator found that all of the drug charges and nursing home claims were allowable but he upheld the disallowance of physicians' fees at an adjusted amount of $1,449,963.46. The Administrator's decision is set forth in a letter to DHR dated January 16, 1976. Georgia commenced this action to challenge the final disallowance by HEW[3] and this Court enjoined HEW from collecting the amount pending the outcome of this action. This challenge has become the controversy of Count I of Georgia's complaint.

Counts II and III of plaintiff's complaint involve similar disallowances which SRS has offset against future reimbursements for Georgia Medicaid expenses. Therefore, no recovery is sought from Georgia; rather, Georgia seeks release of those funds by HEW. The refusal to pay the funds that are the subject of controversy in Counts II and III resulted from a finding in subsequent audits that Georgia had continued to exceed the limits of 45 C.F.R. 250.30 when reimbursing physicians' costs. One audit tested payments made during the first quarter of 1974 and revealed that Georgia had paid $372,632 in claims which were not authorized by its Medicaid plan. SRS deferred payment of this amount until it had reviewed the legitimacy of the claims. The amount deferred was later reduced to $290,175. On February 18, 1976, Georgia was formally informed by the Regional Commissioner, pursuant to the procedures set forth

---

**2.** That total was computed as follows:

| | |
|---|---|
| Drug Charges | $ 75,637 |
| Nursing Home Reimbursement | 275,424 |
| Inpatient Hospital Reimbursement | 546,965 |
| Physicians' Fees | 1,951,277 |
| TOTAL | $2,857,303 |

**3.** A decision by the Administrator of SRS constitutes the final administrative action of HEW. 45 C.F.R. 201.14(d)(11).

in 45 C.F.R. § 201.15, that the claims would be disallowed and payment refused. Pursuant to the provisions of 45 C.F.R. § 201.14, the State requested reconsideration of the Regional Commissioner's decision. The decision was affirmed by the Administrator of SRS on June 27, 1977. This disallowance has become the controversy of Count II of the complaint.

In light of the fact that two previous audits had established that DHR was overpaying physicians, and in light of the fact that Georgia had not yet implemented a system to correct the problem, the Regional Commissioner deferred a portion of federal financial participation claimed by the State for each quarter between April 1, 1974, and June 30, 1975. The total amount deferred was $1,818,146. During this period, members of the staff of the Regional Commissioner conducted an audit based on random sample claims. The audit revealed that Georgia had overpaid doctors some $2,411,-571, including $1,614,788 of federal funds. This latter amount was disallowed by the Regional Commissioner and offset against future reimbursements to Georgia. The difference between the amount initially deferred and the amount ultimately disallowed was released to the State. Georgia requested a reconsideration of this disallowance. The Administrator, after much delay, received evidence submitted by both parties and upheld the disallowance on the basis of findings of fact and conclusions of law set forth in a letter to the State dated June 27, 1977. The State's challenge to that disallowance is the controversy of Count III of the complaint.

## II.  *Count I*

In Count I of the complaint Georgia challenges the findings of fact which supported the Administrator's decision to disallow certain Medicaid claims for reimbursement. Georgia moves this Court to set aside the agency findings and defendant seeks an order affirming the decisions. Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706, governs the scope of judicial review of administrative actions and decisions. Pursuant to the statutory language which states: "the court shall review the whole record or those parts of it cited by a party . . .", courts have held that the "focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). While it is true that de novo review is authorized under 5 U.S.C. § 706(2), that section has been limited to two narrow situations: first where the proceeding is brought to enforce certain administrative actions;  and second where there are inadequate fact finding procedures in an adjudicatory proceeding. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Clearly this action was not brought to enforce the decision by HEW. Rather, plaintiff argues that this Court should ignore the findings by the agency because the procedure used in making the disallowance was fundamentally unfair. The Administrative Procedure Act, 5 U.S.C. 706(2)(D), provides that a reviewing court may set aside the agency's findings of fact and conclusions of law if they were made without observance of procedure required by law. However, section 706 also allows the Court to take into account the rule of prejudicial error.

Georgia argues that SRS ignored the procedures for disallowance which it was required to follow pursuant to 45 C.F.R. § 201.14. SRS argues that it was not bound by the provisions of section 201.-14 because that section was not formally promulgated until after the disallowance had been made. The Court finds that HEW bound itself to those provisions when it sent a letter to Georgia, dated July 15, 1975, in which HEW agreed to conduct the reconsideration in accordance with then proposed regulation 45 C.F.R. § 201.14.

Georgia specifically challenges the Administrator's alleged failure to "forward to the State a list of all items currently in the record, including those received from the Regional Commissioner, and make available for examination . . . such items not

previously received by the State." 45 C.F.R. § 201.14(d)(3). Georgia contends that numerous ex parte communications took place between the Regional Commissioner and the Administrator which never became part of the record and to which Georgia had no opportunity to respond. Georgia suggests that four letters came to the Administrator's attention during the reconsideration period and numerous ex parte conferences took place.

■ The Court overrules these objections and disagrees with Georgia's assessment of the role of the Administrator in the reconsideration process. There is no legal requirement that the reconsideration process be conducted as a full evidentiary hearing; nor should the Court presume that the Administrator will assume the role of an administrative law judge who insulates himself from the parties and who makes his decision in the setting of a full adversary proceeding. To the contrary, while the Administrator is to make an objective decision based on the record and the applicable law, he need not insulate himself from his staff on the daily administration of the Social Rehabilitation Services. The compilation of the record referred to in section 201.14 need not include all communication between the Administrator and his staff, but only that which is relevant to the reconsideration and upon which the Administrator will rely in making his determination. Georgia is protected from the use of evidence outside the record, of which it is unaware, by the requirement that the Administrator's decision be based on the record. Georgia is protected from the compilation of a narrow and limited record, which is designed to produce a given result, by its right to produce evidence for inclusion in the record. However, if Georgia can show that the Administrator's exclusion of certain evidence from the record prejudiced his decision, then this

Court would be justified in setting aside that decision.

Georgia has shown no prejudice which resulted from the exclusion of certain items from the record, nor can this Court conclude that such prejudice resulted. Georgia contends that the certified record, which it was allowed to see and rebut, pursuant to section 201.14, was not the actual record used by the Administrator, but that the record used was "full of surreptitious communications." In support of this contention, Georgia submits "State Exhibits L, M. and N"[4] which contain more than 135 unnumbered pages, many of which are so poorly duplicated that they are illegible. In comparing the State's Exhibits to the Certified Administrative Record, the Court finds only four items which are contained in State's Exhibits but which were not found in the Certified Administrative Record.

First, Georgia shows that a letter from the SRS financial advisor to the Deputy Regional Commissioner/State Programs was excluded from the record. This letter, which is poorly duplicated, seems to be nothing more than a discussion of the progress of certain HEW and DHR employees in effecting administrative changes within the DHR. This letter has little, if any, relevance to the question of the disallowability of physicians' claims. The failure to include that letter in the record and to allow Georgia an opportunity to rebut the facts therein was not prejudicial in this case. Second, Georgia argues that it was prejudicial to exclude the letter from the Regional Commissioner which explained the process of reconsideration.[5] This letter was originally sent to the Georgia DHR and so Georgia's ability to respond was not restricted by the failure of the Administrator to include it in the record. Such exclusion was not prejudicial. Nor can Georgia show prejudice from the exclusion of a memoran-

---

4. These documents were produced by HEW as the result of a discovery request by Georgia and are purported by Georgia to be the record actually used by the Administrator.

5. Georgia asserts that this letter was a refusal to process the reconsideration. Clearly the

contrary is true and the letter, both in substance and in tone, expressed a willingness to process the reconsideration as soon as Georgia forwarded the proper documents to the Regional Commissioner.

dum from Perry Childer to Jerry Hunter, dated August 21, 1974, or a memo from Hunter to Cecil Smith, dated October 21, 1974. Both memoranda appear to explain the applicable limits of 45 C.F.R. 250. These memoranda were legal advice, and while Georgia did not have an opportunity to respond to these precise documents, it did have ample opportunity to present its interpretation of 45 C.F.R. § 250, which forms the center of this entire controversy.

Georgia further suggests that numerous ex parte hearings and meetings were conducted by the Administrator to the prejudice of DHR. Georgia fails to specify when these meetings took place or what evidence was given that prejudiced Georgia. The assertions are supported with nothing more than the implication that such meetings must have taken place. This Court has previously stated that the Administrator should not be required to isolate himself from his staff, nor should he be required to disclose all of the internal communications which are involved in the administration of the SRS merely because Georgia has a pending reconsideration. Moreover, Georgia's strong attack on the sufficiency of the fact-finding process is substantially diluted by the fact that the State failed to take advantage of the rights afforded in section 201.14. Georgia submitted no evidence, made no arguments and requested no conferences with the Administrator. Georgia was ignorant of neither the arguments nor evidence presented to the Administrator.

■ For all of the reasons stated above, the Court concludes that the fact-finding process before the agency was sufficient. Having so found, the Court further concludes that the review of the agency's findings is limited to a review of the Certified Administrative Record to determine whether the Administrator's actions were arbitrary and capricious. 5 U.S.C. § 706(2)(A).[6] In applying this test, the agency action is

entitled to a presumption of regularity and the decision will be upheld unless it resulted from a clear error in judgment, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), or constitutes a willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case. *First National Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1376 (8th Cir. 1974).

■ Georgia asserts that the Administrator's decision was arbitrary and capricious because the amount of overpayment was determined by use of a statistical sample rather than by individual claim-by-claim review. The Court concludes that the use of statistical samples was not improper. Projection of the nature of a large population through review of a relatively small number of its components has been recognized as a valid audit technique and approved by federal courts in cases arising under Title IV of the Social Security Act. *See New Jersey Welfare Rights Organization v. Cahill*, 349 F.Supp. 501 (D.N.J.1972); *Rosado v. Wyman*, 322 F.Supp. 1173 (E.D.N.Y.1970), *aff'd*, 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971). Moreover, mathematical and statistical methods are well recognized as reliable and acceptable evidence in determining adjudicative facts. *See Jones v. Georgia*, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (finding of discrimination based entirely on jury selection statistics and absence of explanation); *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (same); *Maxwell v. Bishop*, 398 F.2d 138, 141–148 (8th Cir. 1968), *rev'd on other grounds*, 398 U.S. 262, 90 S.Ct. 1578, 26 L.Ed.2d 221 (1970) (racial discrimination in application of death penalty); *Gautreaux v. Chicago Housing Authority*, 296 F.Supp. 907, 910–914 (N.D.Ill.1969) (housing discrimination); *Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F.Supp. 670 (S.D.N.Y.

---

**6.** When the Court is reviewing agency rulemaking or action based on public adjudicatory hearings, the standard of review is whether the findings are supported by substantial evidence. 5 U.S.C. § 706(2)(E). But in situations such as the one sub judice, the scope of review is more narrow and the agency action must be upheld unless it is found to be arbitrary and capricious. *See Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

1963) (unfair competition; sample of consumers). However, to find that statistics may be admitted as evidence of a proposition is not to say that the statistical model will always be conclusive. The weight which must be given to such statistical evidence is necessarily one which must be considered by the fact finder in light of the practical difficulties in obtaining a claim-by-claim review. In the instant case, statistical sampling was the only feasible method of audit available to HEW. The Office of the Regional Commissioner is charged with the responsibility for reviewing the operation of state programs in eight states. Audit on an individual claim-by-claim basis of the many thousands of claims submitted each month by each state would be a practical impossibility as well as unnecessary. HEW uses the statistical samples merely to form the initial decision to defer a claim. A permanent disallowance is not made until after the state has had an opportunity to present evidence. 45 C.F.R. § 201.14. Through such a procedure, the state could present evidence to challenge the statistical samples of HEW. This is not an unreasonable burden. The state maintains a copy of each physician's actual claim. Moreover, the state is ultimately charged with the duty of proving the allowability of deferred claims. 45 C.F.R. § 201.15(c)(7). In this case, Georgia did not challenge the HEW sample during the disallowance reconsideration. The only evidence which was before the Administrator was the statistical sample which was submitted by the Regional Commissioner. The Court concludes that it was not arbitrary and capricious for the Administrator to use that statistical sample as a basis for his findings of fact.

■ Georgia next contends that the Administrator's decision must be set aside because the auditors misconstrued and misapplied the physicians payment limits of 45 C.F.R. § 250.30(b).[7] Subsection (i) of § 250.-30(b) limits the allowable Medicaid charge for a given procedure or service to the lowest of three criteria. Subsection (ii) imposes ceilings which the amount determined in subsection (i) may never exceed. The first and third criteria of subsection (i) were used in the audit of Georgia claims. The second was not. Neither were the ceiling limits of subsection (ii) imposed. However, since the allowable Medicaid charge is limited to the *lowest* of the three criteria of subsection (i), the omission of the second was not prejudicial. If it had been included, the only possible legal result would have been to *lower* the allowable charge and thereby increase the amount of the disallowance. Likewise, the exclusion of the ceiling limits of subsection (ii) was not prejudicial. These amounts could only be used to lower the permissible charge and increase the amount of disallowance.

Georgia contends that the lack of prejudice should never be allowed to defend the failure to comply with established procedure. *See Gonzales v. United States*, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955); *Morgan v. United States*, 304 U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1937). However, those cases are distinguishable. First, this is not a criminal or quasi-criminal proceed-

7. In October 1976, the provisions of 45 C.F.R. § 250.30 were renumbered. The citation within this order refers to the current version. Section 250.30 provides in pertinent part:

(i) Payment to individual practitioners is limited to the lowest of
(A) His actual charge for service;
(B) The median charge for a given service derived from claims processed or from claims or services rendered during all the calendar year preceding the start of the fiscal year in which the determination is made; or
(C) His reasonable charge recognized under Part B, title XVIII.
(ii) In no case may payment exceed the highest of

(A) Beginning July 1, 1971, the 75th percentile of the range of weighted customary charges in the same localities established under title XVIII during the calendar year preceding the fiscal year in which the determination is made;
(B) The prevailing charge recognized under part B, title XVIII, for similar services in the same locality on December 31, 1970, and found acceptable by the Secretary; or
(C) the prevailing reasonable charge recognized under part B, title XVIII.
The reference within this section to part B, title XVIII is to the Medicare provisions of the Social Security Act.

ing in which the rule of prejudicial error is strictly construed; second, this case involves a situation where it is legally impossible for the omitted procedures to have benefited the plaintiff. For this reason, Georgia's attack on this aspect of the Administrator's decision lacks merit.

■ Georgia next argues that certain substantive findings of the Administrator must be set aside as arbitrary and capricious. The Administrator's findings which are challenged are as follows: (1) the original sample of physicians' claims was not biased; (2) the pricing of sample claims was accurately and consistently done by qualified Medicare clerks; (3) the Medicare data used in pricing the sample claims were consistent; and (4) Medicare data necessary to screen physicians' claims were available to the State. The administrator considered Georgia's position on each of these issues in light of evidence submitted by Georgia and the Regional Commissioner of SRS and ultimately resolved these issues in favor of SRS.

The record shows that there was a bias toward costly physicians' claims when the audit was first conducted. This resulted from the fact that the sample was drawn from checks issued by Georgia in making payments without regard to the fact that one check could have included payment for separate claims. But the record also shows that SRS took action to correct this bias by making certain statistical adjustments. Georgia consented to these adjustments in a letter to the Regional Commissioner dated October 31, 1974. Based on the relevant factors, including Georgia's agreement, the Administrator concluded that the bias had been corrected. The Court finds that the Administrator's decision was not arbitrary or capricious.

The Administrator also considered Georgia's complaint that the pricing of Medicaid claims by Medicare personnel[8] was inconsistent and incorrect. There is evidence to support the Administrator's finding that the pricing was sufficiently accurate to be considered reliable in this disallowance dispute. The evidence shows that the statistical model used by SRS took into account any mistakes that were made. Furthermore, there is no evidence to support Georgia's contention that the Medicare checks were unqualified. The Court finds that the Administrator's decision to accept the pricing of sample claims was not arbitrary or capricious.

The Administrator next considered Georgia's allegation that the Medicare data used to price the sample claims were inconsistent. At the base of Georgia's complaint was the contention that variations in charges for a given service were greater than 100 percent in some cases. The record shows that while these variations existed, they merely reflected the cost of Medicaid care from location to location and did not result from errors in data. The Court finds that the Administrator's decision to accept these results was not arbitrary and capricious.

Finally, Georgia complained that the Medicare data used to screen the Georgia claims were not available to Georgia and, therefore, the use of those data was arbitrary and capricious. The Administrator considered this objection and found that Georgia had made no attempt to obtain the data until August 1973, and it appears that Georgia made no written request until December 1973. The Court finds that the Administrator's decision to resolve this objection in favor of SRS was not arbitrary or capricious.

For the reasons stated above, this Court finds that the fact finding procedure during the reconsideration procedure was sufficient and that the Administrator considered all of the substantive challenges made by Georgia. His resolution of those issues in favor of SRS was neither arbitrary nor capricious and accordingly, those findings are hereby AFFIRMED by this Court.

### III. Counts II and III

■ Georgia contends that HEW has no authority, absent that granted in 42 U.S.C.

---

8. Such a procedure is necessary to compute the reasonable payment under Medicare which is then compared with the actual physician's claim. See 45 C.F.R. 250.30(b)(3).

§ 1396c,[9] to withhold funds from the State. Plaintiff argues that 42 U.S.C. § 1396b contains no provision for a deferral or disallowance of claims made by the State and that the Secretary has no discretion in making the payments required by § 1396b(d)(2). That section provides that the Secretary shall pay the estimated amount to which the State will be entitled during the next quarter. That estimated amount is to be "reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made" for any prior quarter. Georgia contends that when calculating the amount of overpayment, the Secretary must accept the actual expenses which the State claims to have made and then compare that with the amount HEW paid to the State as an estimated amount. The Court prefers the construction of this statute which is proffered by HEW and finds that the Secretary has the statutory and common law authority to question the amounts claimed by the State to be reimbursable expenditures when making the determination whether overpayments were made. The State is not entitled to reimbursement at its behest. Section 1396b(a)(1), (2) imposes a duty to reimburse a state only for expenses which were properly expended by the State. The process of disallowing certain items from Georgia's statement of actual expenditures is specifically allowed in 42 U.S.C. § 1316(d).[10] Moreover, such a right is implied from the common law right to recover, by setoff or recoupment, federal funds which have been improperly or illegally disbursed. See Mount Sinai Hospital of Greater Miami v. Weinberger, 517 F.2d 329 (5th Cir. 1975).

■ Having decided that HEW has the substantive right to withhold reimbursement for improper claims, the Court is now confronted with whether Georgia has a right to a pre-setoff [11] hearing.

Georgia contends that even if the Administrator has the authority to disallow claims, it is granted the right to a pre-setoff hearing by 42 U.S.C. § 1396c and 45 C.F.R. § 201.14. In support of its contention that 42 U.S.C. § 1396c grants a right to a pre-setoff hearing, Georgia cites State Department of Public Welfare of State of Texas v. Weinberger, 388 F.Supp. 1304 (W.D.Tex. 1975); aff'd, 556 F.2d 326 (5th Cir. 1977). In that case the Texas Department of Public Welfare, which administered the Medicaid and Medicare programs, had purchased various services from other State agencies at a cost of more than $92 million. HEW refused to reimburse Texas for any of that cost because such expenditures were not within the scope of the Texas plan. The Fifth Circuit classified HEW's action as a plan-conformity dispute under 42 U.S.C. § 1316(a) [12] rather than an "audit" dispute under section 1316(d). As evidence that HEW's termination of funds was a plan-conformity dispute was the fact that HEW had denied all payment for any of the pur-

9. 42 U.S.C. § 1396c provides:

> If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds—
> (1) that the plan has been so changed that it no longer complies with the provisions of section 1396(a) of this title; or
> (2) that in the administration of the plan there is a failure to comply substantially with any such provision;
> the Secretary shall notify the State agency that further payments will not be made to the State.

10. 42 U.S.C. § 1316(d) provides:

> Whenever the Secretary determines that any item or class of items on account of which Federal financial participation is claimed under subchapter I, VI, X, XIV, XVI, or XIX of this chapter, or part A of subchapter IV of this chapter, shall be disallowed for such participation, the State shall be entitled to and upon request shall receive a reconsideration of the disallowance.

11. There appears to be some confusion on the part of Georgia regarding the meaning of the terms "deferral" and "disallowance." A deferral is nothing more than a setoff which occurs prior to a hearing. See 45 C.F.R. § 201.15. After the State has been heard and the decision to set off has been affirmed by final agency action, the setoff is said to be a disallowance. See 45 C.F.R. § 201.14.

12. 42 U.S.C. § 1316(a) grants to the Secretary authority to approve or disapprove state plans and thereby qualify those plans for federal financial participation.

chased services. The Court concluded from the denial that the termination of funds was based on HEW's finding that Texas had failed to comply substantially with the provisions of its plan. *See* 42 U.S.C. § 1316(a). Once it was decided that HEW's termination was a plan-conformity dispute, the Court held that HEW was required by 42 U.S.C. § 1396c to give Texas a full administrative hearing. However, this holding cannot be construed to suggest that any withholding of funds by HEW must be preceded by a section 1396c hearing. Indeed the legislative history of the act reveals that section 1396c was not intended to be the exclusive method for HEW challenges to State spending:

> Some State and local officials believe that some form of judicial review should encompass all aspects of public assistance programs, including matching issues and audit exceptions. However, the much greater concern is for review of decisions regarding plan conformity issues. The Commission [on Intergovernmental Relations] believes that to involve audit exceptions or issues other than plan conformity in the judicial review process would create many additional problems.

111 Cong. Rec. 3068 (remarks of Sen. Javits, Feb. 18, 1965), as cited in *Texas DPW*, 556 F.2d at 332. For these reasons, this Court concludes that the adjudicatory provisions of § 1396c apply only to plan conformity disputes.

Unlike the *Texas DPW* case, the case sub judice is not properly characterized as a plan conformity dispute. HEW did not terminate reimbursement of all physicians' services; rather it merely refused to pay the cost of services which exceeded the State plan. There is no dispute between Georgia and HEW as to the type of services covered by the Georgia plan or even as to the cost of services which are reimbursed pursuant to the plan. The only dispute is a clerical one: whether Georgia, in fact, over-

paid physicians for services rendered. For these reasons, this Court concludes that the dispute between Georgia and HEW is properly classified as an audit dispute under section 1316(d), and therefore section 1396c has no application to this case.

Even without the statutory hearing of section 1396c, Georgia argues that HEW is required to give a pre-setoff hearing by 45 C.F.R. 201.14. In support of this position, the plaintiff relies on *California v. Weinberger*, C75–0391 RHS (N.D.Calif., Nov. 4, 1977), which involved a similar challenge to HEW's process of deferral. There the Court held that HEW had no established procedure to defer reimbursements and then grant a post-setoff hearing. That case is inapposite because it was decided before the promulgation of 45 C.F.R. § 201.14 which now provides for a post-setoff hearing.[13] Since Georgia is unable to point to any statutory or regulatory right to a pre-setoff hearing, whether section 201.15 is allowable is necessarily a question of constitutional stature which involves a determination of whether Georgia was afforded due process in the disallowance procedure.

■ Consideration of what procedures due process may require under these circumstances must begin with an understanding that although the concept of due process is flexible, its vitality comes from a recognition that not all situations calling for procedural safeguards call for the same kind of procedure. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

The concept of a hearing before the deprivation of property has been most widely analyzed in the context of debtor-creditor relations. *See North Georgia Finishing, Inc. v. Di-Chem*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556

**13.** Georgia argues that section 201.15, which effectively eliminated its right to a prior hearing, was enacted after the funds were actually set off and therefore constitutes an ex post facto law. Such an argument is without merit

in a civil action. *Calder v. Bull*, 3 Dall. 386, 3 U.S. 386, 1 L.Ed. 648 (1798). Moreover, section 201.15 is properly characterized as a procedural device rather than a definition of substantive rights.

**414**

(1972); *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1967). However, these cases are distinguishable because of the nature of the interests invoked. More directly on point, it has been held that a private welfare recipient is entitled to a hearing before any benefits are terminated. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287. However, the Court does not construe that case to indicate that the constitution requires a hearing prior to the setoff of Medicaid reimbursements. The interest of the private welfare recipient in *Goldberg* is quite different from that in which the State of Georgia finds itself. Termination of benefits to an individual means the denial of that person's means of existence. While there is no doubt that Georgia is in a position to suffer economic harm, the equities of the situation do not compel a pre-setoff hearing. *See Mercy General Hospital v. Weinberger*, 410 F.Supp. 344 (E.D.Mich. 1975); *Russi v. Weinberger*, 373 F.Supp. 1349 (E.D.Va.1974). *Cf. Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (holding that due process does not require that a recipient of Social Security disability benefits be given a pre-termination hearing). Georgia argues that a withholding of reimbursement funds will indirectly reduce the amount of services which individual recipients receive. However, it must be kept in mind that HEW did not terminate reimbursement for those services which the Georgia plan provides. Were that the case this would be a plan-conformity dispute and Georgia would have a statutory right to a prior hearing. In the case sub judice, HEW has only refused to pay for improper service fees. Such a refusal should have a minimal effect on the quality of services which Georgia *properly* provides to individual recipients.

The Court concludes that Georgia was not entitled to a pre-setoff hearing. Georgia was afforded a post-setoff hearing as provided by 45 C.F.R. § 201.15 and § 201.-14.[14] These provisions allow the State an opportunity to submit evidence and to have a final decision, based on the administrative record, setting forth findings of fact and conclusions of law. *See* 45 C.F.R. § 201.14. Such a procedure is sufficient to satisfy the requirements of due process. In summary the Court concludes that the process of audit, deferral and disallowance were within the scope of HEW's authority and did not deny Georgia any statutory or constitutional rights.

▪ Having so found, the Court is next confronted with Georgia's substantive challenge to the findings and decision by the Administrator with respect to Counts II and III. The Court has read and considered the decisions [15] and the records upon which those decisions were based. The Court finds that the Administrator considered each objection raised by Georgia and that he resolved those issues in favor of SRS. Further, the Administrator considered evidence submitted by both sides and upheld the decision of the Regional Administrator to disallow certain claims. The action by the Administrator was supported by proper evidence and was not arbitrary or capricious. Accordingly, the decisions of the Administrator are hereby AFFIRMED and ADOPTED by this Court.

IV. *Summary*

For the reasons stated above, the motions by Georgia for summary judgment are hereby DENIED; the motions by HEW for judgment affirming the administrative decisions are hereby GRANTED. The preliminary injunction which was entered June 29, 1976, and which prohibited the collection by HEW of the amounts subject to dispute in Count I is hereby VACATED.

---

14. Section 201.14, in addition to being a procedure for disallowance of claims in the first instance, is incorporated into section 201.15 and provides the method of appeal from a deferral at the Regional level.

15. These are set forth in separate letters to DHR dated June 27, 1977.