**COMMONWEALTH OF MASSACHU-
SETTS, by its Department of
Public Welfare, Petitioner,**

v.

**DEPARTMENTAL GRANT APPEALS
BOARD OF the UNITED STATES DE-
PARTMENT OF HEALTH AND HU-
MAN SERVICES, et al., Respondents.**

No. 82–1364.

United States Court of Appeals,
First Circuit.

Argued Oct. 7, 1982.

Decided Jan. 12, 1983.

William L. Pardee, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Leah S. Crothers, Asst. Atty.

---

**6.** *See* H.R. 6715, 95th Cong., 1st Sess. § 3(f); H.R.Rep. No. 700, 95th Cong., 1st Sess. at 73– 74 (1977).

Gen., and Ellen L. Janos, Asst. Atty. Gen., Boston, Mass., were on brief, for petitioner.

Robert A. Dublin, Atty., Annandale, Va., with whom Juan A. Del Real, Gen. Counsel, and Ann T. Hunsaker, Asst. Gen. Counsel, Washington, D.C., were on brief, for respondents.

Before PECK,* Senior Circuit Judge, CAMPBELL and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

This is a petition filed by the Commonwealth of Massachusetts seeking review under 42 U.S.C. § 1316(a)(3) of an administrative determination by the Secretary of Health and Human Services. The challenged decision would require Massachusetts to bear alone—without federal financial aid—the full cost of unrecovered excess interim payments which the state made to nursing homes under the joint federal-state medical assistance program known as Medicaid. We dismiss the petition for want of jurisdiction, holding that the disputed determination is not one for which Congress has provided review in a court of appeals.

To determine the applicability of the statute upon which Massachusetts relies to obtain direct review in this court, it is necessary to ascertain the nature of the administrative proceeding in question. We begin by describing the dispute between Massachusetts and the federal agency which led to the actions now challenged.

I. *The Dispute*

Massachusetts contests the refusal of the federal government to reimburse it (up to the appropriate federal share under the Medicaid program) for sums now owed to Massachusetts by certain defunct, insolvent, or otherwise unwilling nursing homes. This indebtedness arose in the course of a federally approved practice—followed by Massachusetts and some but not all other states— of making payments to nursing homes on the basis of interim rates, subject to later adjustment. Simply put, the practice works as follows: At the close of each

month, nursing homes submit to Massachusetts a report of the number of Medicaid patient days they have during that month. Massachusetts then reimburses them at an "interim rate" expressed as a single per patient, per diem amount. The interim rate is set on the basis of the actual costs of a prior year, adjusted for inflation. At the close of the 12-month interim period, the state computes a final rate based on the actual allowable costs for that period. If the interim rate turns out to have been lower than the final rate, the state includes the amount of underpayment in its payments to homes under the new interim rate. If the interim rate was too high, the state either obtains direct reimbursement from the providers or else subtracts the amount of excess payments from subsequent payments to them. The state credits the federal government for the latter's share of any monies thus recovered.

A practical difficulty with the above procedure—and one which gave rise to this case—is that Massachusetts often cannot recover excess payments where the recipient has entered bankruptcy, gone out of business, or ceased to participate in the Medicaid program. There are then no ongoing payments from which to subtract a previous overpayment; and actual repayment is unlikely at best.

The above described system of advance payments to nursing homes and later adjustments runs parallel to the system whereby Massachusetts receives the federal contribution toward the same Medicaid outlays. Massachusetts presents the Department of Health and Human Services ("HHS") with quarterly cost estimates based on the prevailing interim rate. Upon approval by the Secretary, the agency advances to Massachusetts its share of the estimated expenses for the upcoming quarter. At the close of the quarter, Massachusetts is required to submit a report of actual expenditures. HHS reviews the report, and notes any expenditures as to which it believes federal financial participation

---

* Of the Sixth Circuit, sitting by designation.

("FFP") is not allowable. It then adjusts the next quarterly advance to reflect what it deems to be previous over or underpayments. *See* 42 U.S.C. §§ 1396b(d)(1), (2).

The Health Care Financing Administration ("HCFA") is the branch of HHS charged with the administration of the Medicaid program at the federal level. Over the last half of 1979, HCFA conducted an apparently routine audit of the accounts receivable ledger cards maintained by the Massachusetts Department of Public Welfare. The audit revealed outstanding unrecovered excess payments made under former interim rates. One hundred forty-seven nursing homes owed the Commonwealth a total of $10,231,222, of which the federal share was $5,115,610. On February 21, 1980, HCFA wrote the Massachusetts Commissioner of Public Welfare requesting him to deduct that amount from the next quarterly submission. Should he fail to do so, HCFA planned to reduce its grant appropriately. The Commonwealth then sought reconsideration of this "disallowance" before the federal Departmental Grant Appeals Board (reserving, however, the question of whether or not the Board had jurisdiction insofar as the determination by HCFA raised a question of state plan compliance). The Board upheld the HCFA's decision, and the Commonwealth then sought review in both this court and the district court. The district court action has been stayed pending our decision.

The basic issue comes down to whether the Secretary erred in treating as "overpayments," 42 U.S.C. § 1396b(d)(2), funds which he had earlier advanced to the state for provider payments on the basis of overgenerous interim rates and which the state had not returned. Massachusetts argues that it is liable solely for those payments it has actually recovered from providers. The Secretary contends that the state alone bears the risk of the inevitable bad debts arising under the system of advance payments provided for in its plan. We can only reach this substantive question, however, if section 1316(a)(3) empowers us to entertain Massachusetts' petition for review. We now turn to this issue.

## II. *Review Under Section 1316(a)(3)*

■ Section 1316(a)(3) of 42 U.S.C. provides that a state dissatisfied with a final determination of the Secretary "under section 1396c" (and the equivalent provisions of other portions of the Social Security Act) may file a petition for review of that determination with the United States court of appeals for the circuit in which the state is located. Massachusetts contends that the decision presently in dispute was, in substance if not in form, a final determination of the Secretary under 42 U.S.C. § 1396c and hence reviewable here under section 1316(a)(3). The Secretary disputes this. He asserts that the action of the Departmental Grant Appeals Board was not "final" and that, in any case, the agency's action was not regarded by itself as a determination pursuant to section 1396c, nor was it functionally such a determination. Rather, argues the Secretary, the Board's decision was merely a so-called "disallowance" for which Congress has not provided direct court of appeals review.

Putting aside the order's claimed lack of finality, we turn directly to the issue of whether the Secretary's action was in reality a determination under section 1396c. If not, we lack jurisdiction and can proceed no further.

### A. Determinations Under Section 1396c

Section 1396c is best understood in light of other provisions of the Medicaid statute, Title XIX of the Social Security Act, codified at 42 U.S.C. §§ 1396–1396i. Title XIX begins by authorizing federal funding for medical and rehabilitation services provided by states which have a plan for medical assistance approved by the Secretary. *Id.* § 1396. Clause a of section 1396a sets out 36 requirements which a state plan must meet for approval. With certain exceptions not relevant here, the Secretary is directed to approve any plan which fulfills all these conditions. Section 1396b, entitled "Payment to State-Computation of Amount," provides how, when, and in what amounts

the Secretary is to reimburse states with approved plans.

Section 1396c, the provision in question, allows the Secretary to shut off funds, in whole or in part, if a state plan "has been so changed that it no longer complies with the provisions" of section 1396a, or if "in the administration of the plan there is a failure to comply substantially with any such provision."[1] Such shut-off may occur only "after reasonable notice and opportunity for hearing" to the interested state agency.[2] Section 1316(a)(3) authorizes court of appeals review of a final adverse determination under section 1396c.

A straightforward example of a compliance proceeding under section 1396c is *Connecticut State Department of Public Welfare v. Department of Health, Education & Welfare*, 448 F.2d 209 (2d Cir.1971). There the Secretary determined initially that Connecticut was failing to comply with federal requirements when it modified its plan so as to place a ceiling on the reimbursement of nursing home costs. The Secretary moved to cut off federal funding. After administrative proceedings, in which the Secretary maintained his position, the matter was reviewed by the Second Circuit, and the Secretary was upheld.

### B. Disallowance

The Secretary processed the present claim not as a determination of noncompliance under section 1396c but simply as a "disallowance." The agency notified Massachusetts that it should deduct the contested amount from its quarterly request for federal reimbursement, and that if it did not do so, the federal government would reduce its future grants accordingly. Thereafter Massachusetts appealed the "disallowance" to the Departmental Grant Appeals Board.[3] Had the question been regarded by the Secretary as a matter of compliance, a different administrative procedure would have been followed. *Compare* 45 C.F.R. § 201.14 & App. (Board review of disallowances) *and id.* Part 16 (Board procedures) *with id.* Part 213 (procedures for compliance hearings).

The term "disallowance" is nowhere defined in the statute or the regulations. It appears only once in the statute: "Whenever the Secretary determines that any item or class of items on account of which Federal financial participation is claimed under [the Medicaid program] shall be disallowed for such participation, the State shall be entitled to and upon request shall receive a reconsideration of the disallowance." 42 U.S.C. § 1316(d). Disallowances typically involve a denial of FFP for a narrow item or class of items, and do not, in some general sense, affect the working of the program or federal-state cooperation. Whereas a finding of noncompliance can (although it need not) lead to the cessation of federal participation altogether, a disallowance is merely a retrospective refusal to share in an unauthorized expenditure.

The Secretary's regulations envision disallowances as arising from routine audits of

---

1.  Section 1396c reads in its entirety as follows:
    If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds—
    (1) that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or
    (2) that in the administration of the plan there is a failure to comply substantially with any such provision;
    the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will

no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure). Essentially identical provisions exist for other programs included in the Social Security Act. *See, e.g.,* 42 U.S.C. §§ 304 (Medicare), 604 (AFDC).

2.  The Secretary's regulations call for a full trial-type procedure. 45 C.F.R. Part 213.

3.  As noted, Massachusetts when so appealing protested the disallowance format, contending that in fact a claim of noncompliance was involved.

state expenditures. *See* 45 C.F.R. §§ 201.-10–.14. If the audit uncovers "expenditures in which the federal government may not participate," the state itself is to deduct this amount from its next request; if the state fails to do so, the Secretary will reduce the federal grant accordingly. *Id.* § 201.13. Reconsideration under section 1316(d) (quoted above) is had before the Departmental Grant Appeals Board on the basis of materials submitted by the parties, written analyses, and, if the state so requests, an oral conference. *Id.* § 201.14 & App. The Board may, in its discretion, hold a formal hearing, but only if complex issues or material facts are in dispute. *Id.* § 16.11; *see generally id.* Part 16.

Direct review of the Board's decision of disallowance is not available in the court of appeals. Whether review may be had in the district court remains uncertain. *E.g., State of New Jersey v. Department of Health & Human Services,* 670 F.2d 1284, 1290 n. 11 (3d Cir.1982) (*"New Jersey II"*) (district court review "an open question"), *cert. denied,* —— U.S. ——, 103 S.Ct. 56, 74 L.Ed.2d 60 (1982); *Medical Services Administration v. United States,* 590 F.2d 135 (5th Cir.1979) (dismissing petition for review of disallowance for want of jurisdiction, but declining to decide whether review was available in the district court). The tendency is to allow review in the district court. *See, e.g., County of Alameda v. Weinberger,* 520 F.2d 344 (9th Cir.1975); *State of Georgia v. Califano,* 446 F.Supp. 404 (N.D. Ga.1977). *See also State of Washington v. Schweiker,* No. 81–7414 (9th Cir.1981) (two-judge motions panel) (dismissing petition to

review disallowances because "jurisdiction lies in the district court and not in this court"). While the Secretary formerly argued that disallowances were entirely unreviewable, *see County of Alameda, supra,* he states in this case, as he did in the New Jersey litigation, that he will not contest district court jurisdiction. Of course, the agreement of the parties will not confer jurisdiction if Congress has not done so, *Neirbo Co. v. Bethlehem Shipbuilding Corp.,* 308 U.S. 165, 167, 60 S.Ct. 153, 154, 84 L.Ed. 167 (1939), and we do not now decide whether it has.

### III. *Compliance or Disallowance*

Were we to look solely at the Secretary's own procedures and label, the agency action of which review is here sought would clearly be something other than a proceeding under section 1396c. The Secretary made no findings of the type mentioned in section 1396c, nor did he charge Massachusetts with wrongfully changing its plan or with administering it out of compliance with section 1396a.

We assume, however, that Congress did not mean to allow the Secretary to defeat court of appeals review simply by labelling a compliance-type claim a "disallowance."[4] There is, in fact, a considerable conceptual overlap between the two categories. Any deviation from the state's plan or the numerous provisions of section 1396a may in theory raise an issue of compliance. Yet the Secretary treats many such deviations as disallowances. If the matter arises from a routine audit, is clerical in nature, or focuses upon only a few aid recipients or

---

**4.** The legislative history provides little indication of when we should treat a "disallowance" as actually a compliance determination within our jurisdiction. The parties have not cited, nor have we found, legislative materials that cast much light on Congress's intentions. It does appear that Congress did not intend that direct court of appeals review be indiscriminately available for any disagreement between the Secretary and a state. *See* 116 Cong.Rec. 3068 (1965) (remarks of Sen. Javits). The provisions for administrative and judicial review of the Secretary's conformity and compliance determinations were

designed to assure that the States will not encounter undue delays in obtaining Federal determinations on acceptability of proposed State plan material under the public assistance programs, and that the States will be able to obtain judicial review of their plan proposals at an appropriate stage of the proceedings.

S.Rep. No. 404, 89th Cong., 2d Sess. (1965), *reprinted in* 1965 U.S.Code Cong. & Ad.News 1943, 2090. For the most part, this report only tracks the language of the relevant provisions of the Act. *See id.* at 2090–91, 2150. *See also* H.R.Rep. No. 213, 89th Cong., 1st Sess. 132 (1965).

providers, that classification will usually be upheld. *E.g., State of New Jersey v. Department of Health & Human Services,* 670 F.2d 1300 (3d Cir.1982) (*"New Jersey III"*); *Medical Services Administration v. United States,* 590 F.2d 135 (5th Cir.1979); *Wingate v. Harris,* 501 F.Supp. 58 (S.D.N.Y. 1980); *State of Georgia v. Califano,* 446 F.Supp. 404 (N.D.Ga.1977). On the other hand, where a refusal of FFP touches on matters of far-reaching importance, affecting the overall Medicaid program, courts have tended to disregard the Secretary's "disallowance" label and treat the dispute as involving compliance. *E.g., New Jersey II,* 670 F.2d 1284; *State of New Jersey v. Department of Health & Human Services,* 670 F.2d 1262 (3d Cir.1981) (*"New Jersey I"*); *State Department of Public Works of the State of Texas v. Califano,* 556 F.2d 326 (5th Cir.1977), *cert. denied,* 439 U.S. 818, 99 S.Ct. 78, 58 L.Ed.2d 108 (1978); *Solomon v. Califano,* 464 F.Supp. 1203 (D.Md.1979). The disputes in all the above cases could arguably have been seen as "compliance" issues in that they concerned a failure of the state to follow certain requirements. The distinctions therefore involve differences in degree rather than kind. This is apparent in comparing, for example, *New Jersey II* with *New Jersey III.* In *New Jersey III,* the Secretary "disallowed" payments made by the state to a particular nursing home that he considered improperly certified. The court upheld that treatment. In *New Jersey II,* the Secretary refused retroactive FFP for payments the state had made under other programs to recipients that its Medicaid plan could have covered but at that time did not. The court found that the Secretary had in fact made a determination of noncompliance. Both cases involve payments that were inconsistent with applicable requirements. While the two disputes are undeniably different, this is not because one involved a failure to obey federal or state plan requirements and the other did not—both did, and in this sense the Secretary made a determination of "noncompliance" in both.

Thus, the functional analysis employed in distinguishing such cases as *New Jersey II* and *New Jersey III* presupposes that an action the Secretary has chosen to label a disallowance might also have been conceived of as a compliance matter. However, this will not always be so. A purported disallowance that is not based on a deviation from federal or state plan requirements could *not* have been made under section 1396c, and therefore should not be deemed to be, "functionally," such a determination. It follows that the less a claim should or could *ever* have been processed as a compliance matter, the less justification there is for overriding the Secretary's label and regarding it as such. A condition of section 1316(a)(3) jurisdiction is, after all, a determination by the Secretary "under section 1396c." That requirement would be read out of the statute altogether were courts of appeals to take jurisdiction not only of disallowance matters that *could* have been brought under section 1396c but also of those that should not or could not. Put another way, in deciding whether a claim the Secretary calls a "disallowance" is "functionally" a compliance matter, courts must look not only at factors such as its relative importance, its effect on the Medicaid program, etc., but also at whether the claim, legally and realistically, could have ever been processed under section 1396c, assuming the Secretary were otherwise receptive to that route.

In the present case, therefore, we examine three criteria. First, we consider whether the matter might have fit comfortably within the statutory language of section 1396c, as a determination of noncompliance, if the Secretary had chosen that route. Second, we ask whether it is of such a character, by reason of its generality and importance, as to point towards inclusion under the compliance rather than the disallowance rubric. And, last, we look to the Secretary's chosen procedures and label— not as definitive but as entitled to some respect.

A. Whether the present claim fits within the statutory description of a compliance proceeding

A section 1396c determination of noncompliance requires a finding "(1) that the

[state] plan has been so changed that it no longer complies with the provisions of § 1396a of this title; or (2) that in the administration of the plan there is a failure to comply substantially with any such provision." The words "any such provision" appear to refer to section 1396a;[5] and since (1) is inapplicable here, the question would seem to be whether the Secretary's refusal to reimburse Massachusetts with respect to excess amounts paid to nursing homes is based on a claim that Massachusetts has failed to comply substantially with some provision of section 1396a or, at least, some related federal provision. We think not.

The Secretary makes no such contention. He has never alleged that Massachusetts violated its own plan or federal law when it paid nursing homes at an interim rate and secured initial federal reimbursement on that basis. The procedure was, in fact, federally approved and remains entirely acceptable. The Secretary merely contends that once Massachusetts determined the final rate, the federal share of excess payments made under the interim rate and not returned became "overpayments" which HHS was entitled to deduct under authority of section 1396b(d)(2) allowing the deduction of "overpayments." Massachusetts responds that the Secretary has misconstrued section 1396b(d)(2) and, in fact, has no statutory authority for taking back part of the federal funds paid out on account of interim rates where Massachusetts cannot recover adjusting payments from providers. No part of section 1396a, and no claim of noncompliance with federal requirements, seems to be at issue.

It is true that the Board, in its decision, made reference to section 1396a(a)(13)(E).

This part of section 1396a (since amended) required that nursing home rates be determined "on a reasonable cost related basis." The Board felt that that provision, among others, afforded a "substantive basis" for the Secretary's right to treat payments under the interim rate as overpayments, once a final rate was set.[6] But this reference was not a contention that Massachusetts was out of compliance with section 1396a(a)(13)(E) and should, for that reason, have its federal funding withheld. Rather the statute was invoked to fortify the position that the final, not the interim, rate was the one on which federal reimbursement should be based. The Board cited section 1396b(a)(1) as the "substantive provision ... requiring the Secretary to recover an excess payment based on the State's determination of a final reimbursement rate." It found such excess payments to be "overpayments" for purposes of section 1396b(d)(2).

We recognize that it is not impossible to express the Secretary's position in terms of noncompliance. If "any such provision" in section 1396c is read as meaning any provision of federal law, see note 5, supra, the dispute could be construed as one where the Secretary has found Massachusetts to be out of compliance with a federal requirement that it reimburse HHS for its share of the difference between the interim and the final rate. The problem with this approach is that it proves too much. Every refusal of FFP becomes a determination of noncompliance, the idea of a disallowance is read out of the statute, and the "any such provision" language becomes meaningless. Simply accepting that there is a dispute about

---

5. Notwithstanding the reference in (2) to "any such provision," the Secretary states in his regulations that "[a] question of noncompliance ... may arise from ... the failure of the state in practice to comply with a Federal requirement ...." 45 C.F.R. § 201.6(a). See, e.g., New Jersey I, 670 F.2d 1262 (noncompliance with a federal regulation). See also Solomon v. Califano, 464 F.Supp. at 1208 (provisions of state plan are "federal requirements" for these purposes). For present purposes we need not consider to what extent a state's noncompliance with federal law that is not re-

flected in section 1396a itself might warrant compliance proceedings under section 1396c.

6. The Secretary, in his appellate brief, argues from 42 U.S.C. § 1396b(d)(2) rather than from section 1396a. He characterizes the former section as containing, "an explicit directive to the Department to recover the federal share of overpayments irrespective of state recovery. There is no provision in that sentence limiting the federal right of recovery to the pro rata share of state recoveries."

some sort of federal requirement cannot suffice to make this a compliance question.

The Secretary's theory of withholding is not at all dependent upon his section 1396c power to withhold for noncompliance. He invokes section 1396b(d)(2) for authority to deduct these amounts from current grants, on the ground they were "overpayments." He does not dispute that the excess payments were properly made pursuant to an approved plan. Thus not only does the Secretary make no claim of noncompliance, such a claim would be inconsistent with, or at least irrelevant to, his present theory of recovery. What is involved is a reimbursement dispute, centered on section 1396b(d)(2), that arose not because Massachusetts failed to comply with procedures required by federal law or its plan, but precisely because it did follow those procedures. We thus conclude that it would have been difficult, if not impossible, for the Secretary to have pursued the present dispute under section 1396c.[7]

### B. Nature of Dispute

For reasons just stated, we do not see this as a compliance case when measured against the criteria in section 1396c. In this respect it is distinguishable from most if not all cases where proceedings instituted in a disallowance mode have been held to be, in reality, compliance matters. But even if we were to assume that this *could* have been a compliance action under section 1396c, we doubt that it possesses the special mix of characteristics which have caused courts to disregard the Secretary's label.

We may agree that its outcome, as precedent, could affect the reimbursement of nursing home services generally—not merely of a specific provider or two. It is not about the amounts to be paid for particular treatments, medicines, or the like. It implicates larger issues of federal/state cooperation, and, while not of enormous financial consequence when viewed against total Medicaid expenditures, is clearly of some importance in the operation of the state's program.

Nonetheless, as between compliance and disallowance, this resembles more the latter. In effect, the Commonwealth has requested FFP for individual payments "in which it [has been] found that the Federal Government may not participate." 45 C.F.R. § 201.13. These are specific and isolated payments; the particular homes are limited in number and identified by name; the purported disallowance grew out of a routine audit. The Secretary has focused on a single aspect of specific excess payments in certain limited circumstances, and not on the state's overall ratesetting or payment methodology.

The dispute can be likened to that in *Medical Services Administration v. United States,* 590 F.2d 135 (5th Cir.1979). There an HEW audit revealed a two-month lag between a determination of ineligibility and communication of that information to state claims agents. As a result, some people received benefits for two months after they had been found ineligible. The Secretary refused to provide funds for these excess payments. Presumably there, as here, reimbursement from the recipient was not, as a practical matter, possible. Also, there as here, all agreed that the recipients did not "deserve" the benefits. The only question was who would bear an expense caused by the method of administering the program. The court did not hesitate in finding that it had before it a disallowance, not a conformity, case. "[B]asically this case concerns an audit dispute .... [The Secretary's] decision represented an isolated and highly focused inquiry into Alabama's ability to keep its eligibility lists current and the payment of benefits to ineligibles resulting from its failure to do so." 590 F.2d at 136.

### C. Importance of the Secretary's Characterization

Finally, while we do not attach conclusive importance to the fact that the Secretary

---

**7.** This might be a different case if the state never established a final rate, or made no effort to recover excess payments, or refused to reimburse the federal government for its share of Medicaid expenditures. Such actions might raise questions of compliance with the state plan.

has chosen not to treat this as a compliance matter, we think the Secretary's view in this regard should be given some weight. This is not simply a reflection of standard principles of deference to the agency charged with administration of the Act, though such deference is due. *Lewis v. Martin*, 397 U.S. 552, 559, 90 S.Ct. 1282, 1285, 25 L.Ed.2d 561 (1970). The appropriateness of direct court of appeals review will often depend upon the nature of procedures and sanctions chosen by the Secretary. A final determination of noncompliance will follow a full trial-type hearing, assuring an adequate record to review. Where disallowance procedures have been followed, there is less likely to be a fully adequate record, and Congress's apparent intent that appellate review be on a full record may be frustrated. A determination of noncompliance, moreover, carries with it at least the potential of a cessation of all federal funds. A disallowance, on the other hand, extends no further than the particular expense disallowed. Congress sought to ensure immediate appellate review of the former sanction. The urgency behind that policy choice does not exist where the Secretary has opted for the disallowance route.

In short, the suitability of direct review in this and other courts of appeals is not unrelated to the Secretary's choice of administrative mechanisms. While the actual nature of a dispute is important, so also is the form in which it comes to us. Moreover, the Secretary will often have the kind of knowledge and expertise to know best how to characterize his action. All this is not to say that the Secretary is free to distort the nature of a dispute insofar as its true nature is discernible. We hold only that deference is due, that appellate court review is more appropriate where compliance procedures have been followed at the agency level, and that we will not second-guess the Secretary in a close case.

IV. *Conclusion*

■ For the above reasons, we conclude that the Secretary has properly determined that this is not a compliance matter arising

under to section 1396c, and this court lacks jurisdiction over the present petition for review. We need not decide at this point whether this case actually involves a disallowance in the strict sense, nor whether review may be had in the district court.

At argument, counsel for the Commonwealth expressed concern that were we to reach this result, the Commonwealth would be in the awkward position of being forced to challenge our ruling by petition for certiorari to the Supreme Court before knowing whether it could obtain review in the district court. We also recognize that we are likely to see this case again—either with regard to the district court's jurisdiction or on the merits—and one party or the other may then wish to seek review of related matters in the Supreme Court. We think the interests of all concerned may be better served if we defer the actual entry of judgment in the present case pending further input from the parties as to whether they believe it desirable for us to continue to withhold the entry of judgment until completion of all related proceedings in the district court and in this court. The parties are directed to confer among themselves forthwith and, if possible, to agree upon a joint position on this question. They should file statements of their position or positions, either jointly or separately, within 30 days hereof. We shall then decide whether to enter judgment immediately or to withhold entry pending the completion of related matters.

*Judgment is withheld until further notice. No costs at this time. The district court is authorized to act in related proceedings notwithstanding that judgment has yet to be entered herein. The parties shall file statements of position within 30 days hereof as above required.*