Simon RUSSI, M.D., et al.

v.

Caspar WEINBERGER, Secretary HEW, et al.

Civ. A. No. 73–396–R.

United States District Court, E. D. Virginia, Richmond Division.

April 12, 1974.

J. Patrick Keith, Midlothian, J. Raymond Munholland, Philadelphia, Pa., for plaintiffs.

Raymond A. Carpenter, (for defts. #1, 2 & 3), Asst. U. S. Atty., Richmond, Va., Samuel P. Johnson, III (for deft. #4), Petersburg, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, licensed medical practitioners and their professional corporation, seek declaratory and injunctive relief from alleged illegal refusals to disburse Part B funds properly owing to plaintiffs under the Medicare Act (Title XVIII of the Social Security Act). Jurisdiction is attained pursuant to 28 U. S.C. §§ 2201 and 1331 and 5 U.S.C. §§ 701–706. The case is presently before the Court on defendants' motion to dismiss which, being supported by material outside the pleadings, will be treated as a motion for summary judgment, and plaintiffs' cross-motion for summary judgment. (F.R.Civ.P. 56) The issues regarding the motions have been briefed and argued before the Court. Upon the material before it, the Court deems the motions ripe for disposition.

### Medicare Background

In 1965, Congress enacted the Medicare provisions (Title XVIII) of the Social Security Act. Pursuant to an agreement entered into in 1966 with the Secretary of Health, Education and Welfare under the provisions of section 1866 of the Social Security Act, the Petersburg General Hospital (hereinafter called the provider) was certified as a participating provider under Title XVIII. Subsequently the Blue Cross Association (BCA), a non-profit corporation, having been nominated by a group of providers of services which included Petersburg General Hospital, entered into an agreement with the Social Security Administration pursuant to the provisions of section 1816 of the Social Security Act to perform for the Secretary designated functions in the administration of Part A of the Medicare program. Blue Cross Association delegated its duties as a fiscal intermediary for each provider to Blue Cross of Virginia, one of its local Plan organizations under subcontract with Blue Cross Association. By reason of such subcontract, Blue Cross of Virginia (hereinafter called the intermediary) became the fiscal intermediary for the provider, and through such intermediary the Secretary made payments under Part A of the Medicare program to the provider.

Under the Medicare program, a provider is entitled to be paid by an intermediary for the "reasonable cost" of services its furnishes Medicare beneficiaries under Part A of the program (section 1814(b) of the Social Security Act). Certain services performed for the provider are, however, reimbursable from Part B trust fund monies, which are disbursed by contracting carriers engaged by the program pursuant to section 1842 of the Social Security Act. Travelers Insurance Company contracted with the Social Security Administration to act as a carrier for Part B of the Medicare program in the geographic area in which the provider in this case is located.

The Part B trust fund monies heretofore referred to cover reasonable charges for the services furnished Medicare beneficiaries by staff physicians of designated providers. Except where the physicians lease a hospital department and initially bear the costs of operating such department or where the charges for physicians' services have been identified separately from charges for hospital services,[1] neither of which apply in the instant case, charges against the program for the services of physicians under Part B are determined to be "reasonable" only where they are designed to yield, in the aggregate, an amount no greater than that portion of the physicians' compensation related to direct patient care activities (20 C.F.R. 405.480 and 405.485). The Petersburg General Hospital utilizes hospital based staff physicians, specializing in the field of pathology, in the diagnosis and treatment of hospital patients. The plaintiffs, Dr. Simon Russi, et al, contracted with the hospital to perform this function and to staff and operate the pathology department of the hospital.

### Factual Background

From 1966 through 1971, plaintiffs calculated the professional component of their services at 25% of the gross billings of the pathologists' services at the hospital,[2] and sought reimbursement in that amount under Part B.

A review of the hospital's charge record in 1971 allegedly indicated that this percentage charged by the plaintiffs was excessive, and a further investigation was commenced by the intermediary,[3] Blue Cross of Virginia. As a result it was decided that the 25% professional component fee charged by the plaintiff physicians was not in accordance with this contract and Medicare regulations and allegedly yielded in the aggregate an amount greater than the portion of physicians' compensation related to direct patient care activities. To the extent the amount related to direct patient care was determined to exceed such charges, there was allegedly created an overpayment of Medicare Part B trust funds which had to be recouped from the plaintiff physicians. To do so, defendants decided that future payment of Part B claims submitted by the plaintiffs to the carrier would be withheld by the carrier effective December 8, 1971. The government asserts that such withholding of payment is appropriate to conserve government funds by offsetting subsequent reimbursable

---

1. Schedules of charges for physicians' services can be considered to be "identified separately from charges for hospital services" only where they are billed and collected from non-Medicare and Medicare patients alike (20 C.F.R. 405.485).

2. This allocation was apparently arrived at after consultation with the hospital and according to documents filed with the complaint was concurred in by the hospital.

3. Physicians who are "hospital based" and the hospital with which they have arrangements or a contractual relationship are required to provide the Part A intermediary for Medicare with certain specific statistical data. The Part A intermediary, after review and analysis of the data, furnishes the Part B Medicare carrier (the Travelers in the instant case) with the proposed reimbursement rate for professional services rendered by the hospital-based physicians. After review of the calculations upon which the reimbursement rate for the hospital-based physicians' professional component is premised, payment may then be made out of Part B Medicare monies for these services.

claims against the indebtedness arising out of the overpayment.

Plaintiffs allege that at no time prior to the suspension of payments were they afforded an opportunity for a hearing or other review with regard to the alleged over-reimbursement. During the subsequent eighteen months, the suspension of payments allegedly continued while Blue Cross conducted further investigation of the cost reports and cost information previously submitted by the Hospital. As a result of its investigation, Blue Cross has revised downward the professional component rate for the years 1966–1971 inclusively and sent such computations to Travelers for appropriate adjustments.

In the meantime, the non-payment of Part B billings has continued, and unpaid payments to the plaintiffs allegedly exceeded $60,000.00 at the time this action was filed.

■ Initially, there appears little question following the Fourth Circuit decision in Wilson Clinic & Hospital, Inc. v. Blue Cross, 494 F.2d 50 (4th Cir. 1974) that the offsetting of current obligations against alleged previous overpayments is a mechanism legally available to the Secretary. The Court must, however, additionally address plaintiffs' contention, contained in their motion for summary judgment, that due process required that they be given a hearing prior to implementation of any scheme to withhold Part B payments for services rendered. Plaintiffs base this claim on Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), which held that state welfare recipients were entitled to an evidentiary hearing before termination of welfare benefits. That decision, however, was, by its terms, of limited application. Its fulcrum was "brutal need:"

Thus the crucial factor in this context —a factor not present in the case of the blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose government entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.

Goldberg, supra, at 264, 90 S.Ct. at 1018. Comparable circumstances are lacking in this case. The Court is dealing here with a dispute between the government and a professional corporation composed of established doctors. While there is no question that the corporation and the doctors individually have suffered serious consequences, economic and otherwise, as a result of the decision to suspend payments, the situation is closer to that of a blacklisted government contractor than to termination of aid to a welfare recipient. See Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (1964). Ordinarily, in circumstances such as this, suspension of Part B payments can be temporarily borne by the affected doctor or corporation pending resolution of the dispute in a post-action hearing. While it might be argued that precisely this solvency on the plaintiffs' part would enable the government to collect any overpayments at a later time, the method chosen by the government to protect trust fund revenues is not unreasonable. Cf. Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289 (1931).[4] The

4. In cases since Goldberg, the Supreme Court has indicated that as a general rule due process requires a pre-action hearing when the government acts to deprive a citizen of a property interest. See Board of

Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). See also, Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). This case, however, falls within the consistently recog-

equities simply do not impel the Court in plaintiffs' direction.

The Court has considered the possible secondary impact which the refusal to reimburse for Part B services might have on Medicare recipients. However, the plaintiffs in this case continue to be credited for services rendered and such credit will remain irrespective of the outcome of this dispute. The only question is whether amounts credited to plaintiffs will ultimately be offset against amounts allegedly owing by them. If not, payments owing to plaintiffs will be made. Thus, there is no reason to believe that discontinuance of Medicare services by these plaintiffs is inevitable. This, coupled with the availability of Medicare services from other sources, renders the possible adverse effect on recipients insufficient and inappropriate for this Court to upset the administratively constructed grievance procedure by requiring a pre-action hearing.

The Court is not unsympathetic to plaintiffs' contention that the *Goldberg* test can be read as looking not necessarily to functional indigency *per se*, but rather to a disparity of relative interests on the issue of pre-action adjudication such that fundamental fairness demands that one party be preferred. The question remains, however, not what the Court deems preferable but whether it deems the procedure provided fundamentally unfair. Although some courts have implied that limiting relief to a post-action hearing in a case such as this amounts to fundamental unfairness, see Coral Gables Convalescent Home, Inc. v. Richardson, 340 F.Supp. 646 (S.D.Fla. 1972), this Court cannot perceive a similar importunity.[5]

Thus *Goldberg* does not demand a pre-action hearing in this case. The United States Court of Appeals for the Fourth Circuit appears in a recent case to have indicated that a due process hearing need not necessarily be conducted prior to the withholding of reimbursement for Part A Medicare services rendered. Wilson Clinic & Hospital, Inc. v. Blue Cross, *supra*. Such is the position of this Court with regard to Part B payments.

For the reasons stated above, plaintiffs' motion for summary judgment on the grounds of failure of the government to provide a prewithholding hearing must be denied.

■ The Court next must address that portion of defendants' motion to dismiss which asserts that judicial determination of the legality of the government's decision to withhold payments is improper at this time because of the failure of plaintiffs to exhaust their administrative remedies. The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law. See, generally, Davis, Administrative Law Treatise, § 20.01 (1958 ed., 1965 supp.). It provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). The policies supporting the doctrine are not obscure.

A primary purpose is, of course, the avoidance of premature interruption of the administrative process. The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency

---

nized exception delineated in Phillips v. Commissioner, *supra*:

Where, as here, adequate opportunity is afforded for a later judicial determination of legal rights, summary proceedings to secure prompt performance of pecuniary obligations to the government have been consistently sustained.

283 U.S. at 595, 51 S.Ct. at 611. Thus, plaintiffs here can not rest on the presumption favoring a pre-action hearing.

5. The actual holding of *Coral Gables* was that "the failure to afford plaintiff at least a post-reduction hearing constituted a denial of due process." 340 F.Supp., at 650.

develop the necessary factual background upon which decisions should be based. And since agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise. And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages.

McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Furthermore, the doctrine of exhaustion represents "an expression of executive and administrative autonomy" and is to be honored as such. See *id.*, at 194, 89 S.Ct. at 1663. Finally, the exhaustion requirement is supported by practical notions of judicial economy.

A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene. *Id.* at 195, 89 S.Ct. at 1663.

■ An administrative remedy appears presently to exist for plaintiffs in this case. Regulations providing for review in cases such as this are set out in 20 C.F.R. 405.801ff. By affidavit submitted in support of defendants' motion to dismiss, Manuel Levine, Assistant Bureau Director, Division of Technical Policy of the Bureau of Health Insurance of the Social Security Administration has attested that these administrative

review procedures are applicable to plaintiffs and are currently available.[6]

By their terms, these provisions do so apply. Section 405.807(a) provides that "[a] party to an initial determination by a carrier, who is dissatisfied with such initial determination, may request that the carrier review such determination." A similar right to a hearing is offered under § 405.820 to parties remaining unsatisfied after a § 405.807 review. The hearing procedures, §§ 405.820–405.872, fully accord with due process. *Cf.* Wilson Clinic, *supra.* Parties to such proceedings include "an enrollee or an assignee," i. e., a physician. 20 C.F.R. 405.802(b). Finally, the initial determination can be reviewed "with respect to the benefits to be paid . . . to *any party,*" 20 C.F.R. 405.-803 (emphasis added), and the review extends to "contentions as to fact or law relative to the claim at issue." 20 C.F.R. 405.809.[7]

Plaintiffs, however, contend that the suspension of payments by the Secretary should be considered "final agency action" within the meaning of the Administrative Procedure Act, thus finding administrative remedies exhausted although administrative review remains. In support of this position plaintiffs urge that the issues they seek reviewed are "more legal than factual," that the suspension of payments has had an immediate impact upon plaintiffs, and that review would not disrupt the efficient enforcement of the Medicare Act. See Aquavella v. Richardson, 437 F.2d 397 (2d Cir. 1971). Plaintiffs further allege that it has been almost two years since the decision to suspend payments,

---

6. Title 20 C.F.R. § 405.807(c) provides: "The carrier shall provide a period of not less than 6 months after the date of the notice of the initial determination within which a party to the initial determination may request review. The carrier may, upon request of the party affected, extend the period for requesting review." A similar "time of filing request" provision appears in § 405.820(c) governing request for a hearing following informal review. Although the Court is without evidence regarding any time

period set by the carrier or any extension sought, it accepts Mr. Levine's uncontradicted assertion that such review is now available on all issues raised by plaintiffs.

7. Although plaintiffs raise the specter of having to attend more than 4800 separate hearings, it appears that the basic issue, the propriety of plaintiffs' 25% reimbursement calculation and of the government's withholding of compensation, could and would be dispositively resolved in a single hearing.

and neither the Secretary nor his delegates have provided plaintiffs with the factual determinations necessary to justify the suspension. Finally, the plaintiffs assert, quoting from *Aquavella*, that "[n]o particular agency expertise is required to resolve whether the Secretary may suspend payments, whether he must give prior notice, or whether he must hold pre- or post-suspension hearings." 437 F.2d at 404.

With regard to the issues set out immediately above, plaintiffs' position has merit. Whether suspension of reimbursement is a proper administrative tool and, if so, whether a pre-suspension hearing must constitutionally be afforded are not questions the resolution of which is peculiarly within the administrative domain. If they are of a realm of peculiar competence, it is the Court's. What are challenged here are decisions not of administrative adjudication but of the nature of administrative rulemaking. The secretary has established, albeit implicitly, these procedures as modes of administrative operation. There is no indication that this decision is tentative or merely the ruling of a subordinate official. The procedures have been implemented and their impact has been directly and immediately felt. The administrative decision on such procedures is "final" for all practical purposes. See Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L. Ed.2d 681 (1967). The only question presented in this regard is whether these procedural forms are constitutionally and statutorily allowed. This question is properly addressed at this time. For these reasons, the Court has found the legal questions regarding use of the suspension mechanism and denial of a pre-suspension hearing properly justiciable. *Aquavella, supra.* It has, however, upheld the propriety of both. See, *supra,* at pp. 1352–1353.

■ The question of whether proper notice of suspension was given is of a similar nature. Here, however, the question is two-fold, involving not only a claim that pre-suspension notice is required, but also indications that even the requirements of the notice provision adopted by the Secretary himself were not met. Title 20 C.F.R. § 405.804, which the government by affidavit has argued is applicable to plaintiffs, states:

> After a carrier has made an initial determination on a request for payment, written notice of this determination shall be mailed to each party to the determination at his last known address. The notice of the determination shall inform each party to the determination of his right to have such determination reviewed.

If the decision to suspend payments is not final agency action, making timely judicial review of all issues,[8] it must in any event be considered "an initial determination" triggering a right of notice of the availability of administrative review. Plaintiffs aver in their complaint that agency conduct in this case was not in accord with applicable regulations. (See ¶ 40(c) ). They represent in their brief in support of their motion for summary judgment that no notice of the determination leading to suspension was received and avert to the question in their brief in opposition to defendants' motion to dismiss. The government does not appear to address the issue. It is to be noted, however, that plaintiffs' contention in this regard is not supported by affidavit. The Court simply does not have any facts on which to determine what notice, if any, was given in this case. Thus it cannot determine whether the notice given was statutorily or constitutionally sufficient. Thus, while the Court concludes that the issue is properly before it, and that exhaustion on the question of proper notice of the suspension is not required, *cf.* Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), summary judgment will be denied to both parties on this issue.[9] The parties will be given

---

8. See discussion, *infra.*

9. The point is not a technical one. If notice of the availability of administrative review

was denied, the validity of the continued suspension of payment becomes questionable. The absence of notice at one time, however,

the opportunity to further address this issue.

■ Plaintiffs' claims in this action, however, are not limited to the primarily legal, regulation-type issues heretofore discussed. They are also asking this Court for a substantive determination that the decision to suspend payments was not factually justified. As pointed out *supra*, administrative review is available to the plaintiffs on this issue. If the government's position is without factual foundation, the decision to suspend can be reversed. Furthermore, this is precisely the type of claim to which the application of administrative expertise is most appropriate. Agency action thus far on this claim is not final unless plaintiffs choose to accept it; it is, as stated in the regulations "initial." Immediate impact of a factual agency determination in the course of adjudication and absent clear abuse of statutory authority is not in itself sufficient to by-pass established agency review of that decision. Thus, the Court concludes that defendants' motion to dismiss the factual issues for failure to exhaust administrative remedies is well taken.

For the reasons stated above, defendants' motion for summary judgment will be granted and plaintiffs' motion for summary judgment denied with respect to all issues except that relating to the provision of notice of the determination on which suspension of payments was based.[10]

An appropriate order shall issue.

does not defeat the applicability of the offered administrative review once notice was properly given. See, *infra*.

10. The complaint alleged that delegation by the Secretary of certain adjudicatory functions to carriers and intermediaries is beyond the scope of his statutory authority and that due process requires review within

the agency itself. (See Counts 4 & 5). Neither party, however, has further addressed this question in the course of briefing their respective positions on the cross-motions for summary judgment, and the Court finds it unnecessary to rule on this claim at this stage. On the merits of this issue, see *Wilson Clinic, supra*, 494 F.2d at 54.