In the Matter of MONSOUR MEDICAL CENTER, formerly Monsour Hospital & Clinic, Inc., Debtor.

BLUE CROSS OF WESTERN PA., a Pennsylvania non-profit corp., Plaintiff,

v.

MONSOUR MEDICAL CENTER, formerly Monsour Hospital & Clinic, Inc., Defendant and Third-Party Plaintiff,

v.

UNITED STATES of America, Third-Party Defendant.

Bankruptcy No. 80–261.
Adv. No. 80–289.

United States Bankruptcy Court,
W. D. Pennsylvania.

Jan. 30, 1981.

Joseph Friedman, John F. Perry, James H. Webster, Springer & Perry, Pittsburgh, Pa., for plaintiff, Blue Cross of Western Pennsylvania.

James H. Joseph, David T. Donnelly, Joseph & Restauri, P.C., Pittsburgh, Pa., for defendant, Monsour Medical Center.

Philip O'Connor, Asst. U. S. Atty., Pittsburgh, Pa., Stephanie W. Naidoff, Regional Atty., James S. Feight, Jr., Asst. Regional Atty., Philadelphia, Pa., for defendant, United States of America.

608

## MEMORANDUM OPINION

GERALD K. GIBSON, Bankruptcy Judge.

### I. Introduction

Blue Cross of Western Pennsylvania (hereinafter called "Blue Cross") initiated this adversary proceeding on April 25, 1980 by complaint to obtain relief from the automatic stay provided for under section 362 of the Bankruptcy Code, 11 U.S.C. § 362, and to require Monsour Medical Center (hereinafter called "Monsour"), a debtor-in-possession pursuant to Chapter 11 of the Code, to assume or reject an executory contract under section 365 of the Code, 11 U.S.C. § 365. On August 8, 1980, Monsour, also known as Monsour Hospital & Clinic, Inc., answered and filed a nine (9) count counterclaim against Blue Cross, joining, as third-party defendants, the United States of America acting through the Internal Revenue Service, and the United States Department of Health and Human Services (HHS) (formerly known as the Department of Health, Education and Welfare). Blue Cross answered Monsour's counterclaim on September 10, 1980 and HHS filed an answer and counterclaim against Monsour on September 5, 1980. Monsour responded to the counterclaim of HHS on September 10, 1980.

At the pre-trial conference, the Court bifurcated the trial of the case since disposition of the issues raised in the pleadings depend upon the initial determination by the Court of the specific, contractual relationships among the parties on February 22, 1980, the date of Monsour's filing for reorganization. The liabilities of the parties are, in large part, based upon their contractual rights and obligations as of February 22, 1980. In making this initial determination, the Court has confined its examination to the contentions raised in Blue Cross' complaint, Monsour's answer and first count of Monsour's counterclaim, Monsour's third-party complaint against HHS, and the answer and counterclaim of HHS against Monsour.

Upon consideration of the complaint of Blue Cross, the Court ordered Monsour, by order dated August 11, 1980, to accept or reject its executory contract with Blue Cross in accordance with section 365(d) of the Bankruptcy Code, 11 U.S.C. § 365(d). On September 29, 1980, Monsour filed a document entitled "Substituted Acceptance and Rejection of Certain Executory Contracts With Third-Party Reimbursers", wherein Monsour accepted whatever contract the Court may find to have been in existence and executory as of February 22, 1980, the date of the commencement of Monsour's reorganization. Monsour also expressly rejected the executory aspects of any of its prior contracts with Blue Cross.

Blue Cross maintains that at the time of Monsour's filing for reorganization, an executory contract known as the 1976 Agreement, which was extended by mutual consent of the parties, governed the relationship between Monsour and Blue Cross. On the other hand, Monsour argues that three (3) separate contracts between Monsour and Blue Cross have existed since July 1, 1973: the 1973 Contract, the 1976 Contract, and the 1979 Contract, and that as of February 22, 1980, the 1979 Contract was in force and was the only executory contract which Monsour could either accept or reject. HHS argues that the May 25, 1966 provider agreement between HHS and Monsour is an executory contract within the purview of section 365 of the Bankruptcy Code, 11 U.S.C. § 365, and that the election by Monsour to continue as a Medicare provider constitutes an acceptance of the agreement.

After considering the evidence adduced at trial and the contentions of counsel, the Court enters the following findings of fact and conclusions of law.

### II. Findings of Fact

On February 22, 1980, defendant Monsour, a Pennsylvania corporation with its principal place of business located in Westmoreland County, Pennsylvania, filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. Blue Cross, the plaintiff, is a non-profit corporation organized and existing under the laws of the Commonwealth of Pennsylvania.

Blue Cross and Monsour entered into a written contract entitled Participating Hospital Blue Cross of Western Pennsylvania Reimbursement Agreement (Plaintiff's Exhibit # 1) (hereinafter called the "1973 Agreement"), effective July 1, 1973, wherein Monsour agreed to provide hospital services to Blue Cross subscribers, and Blue Cross agreed to provide three (3) disparate methods of reimbursement, namely, (1) retroactive cost method, (2) predicted cost method and (3) prospective cost method. Under the terms of the 1973 Agreement, Monsour, by giving proper notice to Blue Cross, had the right to elect annually one (1) of the methods of reimbursement. The 1973 Agreement outlined in detail the administrative practices and policies applicable to hospital reimbursement, such as practices governing interim payment rates, current financing, cost rate adjustments, reimbursement appeals and dispute resolution. For the fiscal years 1974, 1975 and 1976 (fiscal years run from July 1 of the calender year through June 30 of the subsequent calender year), Monsour elected the retroactive cost method. The retroactive cost method provided that Blue Cross reimburse Monsour retrospectively its "allowable costs" as determined by Blue Cross after audit of Monsour's records for each fiscal year according to accounting procedures established and administered by Blue Cross. The 1973 Agreement did not define "allowable costs"; however, Blue Cross computed "allowable costs" by using a complicated formula known as RCCAC (ratio of charges to charges applied to costs). Pursuant to this formula, Blue Cross paid only the actual costs attributable to the medical care and treatment of its subscribers, rather than the hospital's standard rate. The term "allowable costs" was, therefore, defined by the parties' course of performance.

The 1973 Agreement provided that computation of the final per diem cost rate, and final settlement of monies owed from one party to the other, occurred sometime after the close of each fiscal year. Blue Cross did not pay Monsour its "allowable costs" in one lump sum at the end of the year, but advanced Monsour sums of money through-out the fiscal year in the form of (1) weekly interim payments which were estimates of Monsour's "allowable costs", and (2) "current financing", described below, so that Monsour would have working capital with which to run the hospital. Pursuant to Part II, Section 8 of the 1973 Agreement, Blue Cross agreed to advance Monsour a weekly interim payment based upon a rate equal to the most recently determined rate or one agreed upon by the parties. Disputes regarding an interim per diem rate were governed by the procedures outlined in Part II, Section 8 and in Part V of the 1973 Agreement. Blue Cross also agreed to prepay Monsour pursuant to Part II, Section 9, a sum known as "current financing", outlined in Medicare regulations, Provider Reimbursement Manual, HIM 15, Chapter 24, Section 2410, which was an advancement of monies to the hospital in order to cover the gap from the time that patient care is provided by the hospital until the time that the bill is actually paid by Blue Cross.

Because these payments were simply estimates of "allowable costs" and, therefore, inexact, Blue Cross had necessarily either overpaid or underpaid Monsour for any given fiscal year. Final settlement was possible only subsequent to the audit conducted at the close of the fiscal year and after calculation of the final per diem rate. Each party had an ongoing contractual right to recoup monies due and owing by a method known as cost rate adjustment (CRA). CRA is a retroactive method of bringing the hospital's interim per diem rate and outpatient percentage into line with final, calculated rates after audit. If Blue Cross had underpaid Monsour, it agreed to pay Monsour the entire amount due and owing in one lump sum, in order to equalize reimbursement up to the hospital's "allowable costs". On the other hand, if Blue Cross had overpaid Monsour, Monsour agreed to either repay Blue Cross in one lump sum, or in gradual payments pursuant to a mutually agreed upon plan. Such plan would provide that Blue Cross deduct over a reasonable period an amount from Monsour's week-

ly interim payments during the subsequent fiscal year.

The 1973 Agreement contained no specific termination date, although it did provide in Part VI that, since Monsour had elected the retroactive reimbursement method, the agreement could be terminated by either Monsour or Blue Cross upon expiration of 90 days' written notice to the other party.

On March 12, 1976, Blue Cross and Monsour entered into a two-page written agreement, as required by the Social Security Administration (under whose jurisdiction the Medicare program is conducted), wherein Blue Cross agreed to reimburse Monsour pursuant to an experimental prospective reimbursement method for purposes of Medicare and Medicaid and for Blue Cross private subscribers. The experimental prospective method differed substantially from the method of prospective reimbursement previously offered by Blue Cross under the 1973 Agreement. (See, testimony of Mr. John Jaeger found on pages 122 127 of the transcript of the August 11, 1980 hearing.)

Unlike the retroactive cost method, this experimental program of prospective reimbursement offered inducements to participating hospitals such as Monsour to contain their costs, in the form of bonuses, if the hospital stayed within its annual budget, or penalties, if the hospital exceeded it. The written agreement implementing the experimental prospective reimbursement program (the "1976 Agreement") became effective on July 1, 1976. The 1976 Agreement provided that the 1973 Agreement shall be terminated as of the effective date of the 1976 Agreement and that the terms and conditions of a document, the "Prospective Budget Program Technical Proposal", were incorporated by reference into the 1976 Agreement. The document was submitted by Blue Cross to the Social Security Administration under Request for Proposal (RFP) # SSA–RFP–76 0127 (Plaintiff's Exhibit # 5).

Under the terms of the 1976 Agreement, Monsour and Blue Cross, upon expiration of the three (3) year term of the contract, agreed to enter into the reimbursement agreement in effect at such time between Blue Cross and its other participating hospitals. Neither Medicare nor Medicaid were parties to the 1973 Agreement between Blue Cross and Monsour; however, both were parties to the 1976 Agreement.

The RFP expressly incorporated the 1973 Agreement, an appendix thereto, to the extent that it was not inconsistent with the terms of the RFP. The substantive provisions of the 1973 Agreement, except where inconsistent with the experimental prospective reimbursement method, were therefore applicable in all respects to Monsour and Blue Cross under the 1976 Agreement. Accordingly, the administrative practices and procedures, such as practices governing interim payment rates, current financing, cost ceilings, the concept of "allowable cost" determined by the RCCAC formula, and dispute procedures, of the 1973 Agreement were incorporated into the 1976 Agreement.

The effective period of the 1976 Agreement was originally intended by the parties to cover the reimbursement years commencing July 1, 1976 and ending June 30, 1979. Notwithstanding, in March, 1979 Blue Cross and Monsour agreed orally and in writing to modify the 1976 contract by extending the 1976 Agreement through fiscal year 1980 for Blue Cross private reimbursement purposes. Blue Cross offered its participating hospitals including Monsour, by letter, the option (1) to extend the 1976 Agreement for Blue Cross private reimbursement purposes, (2) to enter into discussions with Blue Cross regarding the continuation of prospective reimbursement or (3) to select the retroactive reimbursement method. Monsour elected to extend the 1976 Agreement through fiscal year 1980 for Blue Cross private reimbursement purposes and Blue Cross received notice thereof on June 7, 1979. Monsour and Blue Cross intended to extend the terms of the 1976 Agreement for Blue Cross private reimbursement purposes; the parties did not intend to enter into a new contract. The prospective reimbursement method and all administrative procedures practiced by Monsour and Blue Cross in regard to Blue Cross private reim-

bursement during fiscal year 1980 and the three (3) previous years, 1977, 1978 and 1979, were identical. The 1976 Agreement, as extended by the mutual consent of Blue Cross and Monsour, was the executory contract that existed between them as of February 22, 1980, the date Monsour filed for reorganization.

As a result of annual audits, Blue Cross determined that Monsour had received excess payments in the amounts of $397,047 and $77,336, respectively, for fiscal years 1978 and 1979. Blue Cross believed that pursuant to the 1976 Agreement, which in turn incorporated Part II, Section 8 of the 1973 Agreement, it had an ongoing contractual right to recoup the 1978 and 1979 overpayments. On October 4, 1979, Blue Cross began to deduct the sum of $6,579.23 from Monsour's weekly interim payments. By letter from Monsour to Blue Cross dated August 10, 1979 (Plaintiff's Exhibit # 207), Monsour expressly accepted the weekly deduction of Blue Cross' alleged overpayment in regard to its private subscribers. Blue Cross continued to make weekly interim deductions of $6,579.23 after Monsour filed for reorganization and has now recouped all of the $397,047 overpayment for fiscal year 1978. Blue Cross is currently deducting $6,579.23 from Monsour's weekly interim payments and intends to continue to do so until all of the 1979 overpayment is recouped.

In November, 1979, Richard S. Ombres, Esq., attorney for Monsour, notified John E. McGrady, Senior Vice-President of Blue Cross, by letter (Plaintiff's Exhibit # 11A) that Monsour wished to appeal, in addition to the Medicare reimbursement deductions, certain audit adjustments in regard to Blue Cross private reimbursement for fiscal year 1978. By letter dated December 14, 1979 (Plaintiff's Exhibit # 11C) William R. Davis, Assistant Vice-President of Blue Cross, advised Ben Razon, Executive Vice-President of Monsour, that pursuant to the administrative procedure governing dispute resolution, Part V of the 1973 Agreement as incorporated into the 1976 Agreement, Monsour should request an informal meeting of representatives of Blue Cross and Monsour in order to attempt to resolve the dispute. Monsour requested that such a meeting be held in late January, 1980, by letter dated December 20, 1979 from Richard Ombres to John McGrady (Plaintiff's Exhibit # 3), in which Ombres stated that it was his understanding that an informal meeting was in accord with the necessary procedure for resolving disputes. In January, 1980, Blue Cross requested that Monsour provide it with a list of possible meeting dates, but there is no evidence whether Monsour ever replied to Blue Cross' request.

In March, 1980, Blue Cross received the results of its audit of Monsour for fiscal year 1979 and determined that Monsour's interim payments and current financing payments for fiscal year 1980 were too high. Accordingly, on March 31, 1980 in order to minimize a projected, final overpayment to Monsour for fiscal year 1980, Blue Cross reduced Monsour's inpatient per diem rate from $180 to $160 and its outpatient percentage rate from 90% to 60% and concurrently reduced Monsour's current financing payments. Blue Cross believed that it had the contractual right to equalize an estimated overpayment to Monsour for part of the fiscal year by underpaying the hospital a proportionate amount for the rest of the fiscal year. The Court finds implicit in the 1976 Agreement the right of Blue Cross, subject to administrative appeal by Monsour, to make such adjustments throughout the year so as to minimize a projected, final overpayment. This practice has also prevailed in the administration of the plans of Blue Cross and its other participating hospitals. Moreover, each party has the contractual right to recoup any overpayment resulting from these periodic adjustments pursuant to the method of cost rate adjustment which is implemented at the end of each fiscal year.

On May 25, 1966, Monsour entered into an agreement with HHS (formerly HEW) entitled Health Insurance Benefits Agreement (hereinafter called the "1966 Agreement"), wherein Monsour agreed to become a "provider of services" under section 1395x(u) of the Medicare Program, enacted

by Congress in Title 1 of the Social Security Amendments of 1965, P.L. 89–97, Sections 101–122, 79 Stat. 286, July 30, 1965, as Subchapter XVIII of the Social Security Act, codified as 42 U.S.C. Sections 1395–1395ll (1970). Pursuant to the 1966 Agreement, the parties intended to establish an ongoing, contractual relationship governed by the Medicare Program and the regulations promulgated thereunder.

At all times material to this case, Blue Cross has acted under contract with HHS as a fiscal intermediary between HHS and Blue Cross for the distribution of funds pursuant to the Medicare Program. Blue Cross has served as a paying agent on behalf of HHS since the 1950's under various hospital reimbursement contracts.

The 1966 Agreement provided that it may be terminated by either party in accordance with applicable provisions of the Medicare Program; however, neither HHS nor Monsour had terminated the agreement as of February 22, 1980, the date Monsour filed for reorganization. On February 22, 1980, the 1966 Agreement was in the nature of an executory contract, as contemplated by section 365 of the Bankruptcy Code, 11 U.S.C. § 365. From 1966 until the present, Monsour provided hospital services to Medicare patients, but did not charge any patient directly for items or services covered under the Medicare Program pursuant to Section 1395cc(a)(1). Blue Cross, the fiscal intermediary, reimbursed Monsour the "reasonable cost", Section 1395x(v), of services covered by Medicare, Sections 1395d and 1395y, on an interim basis based upon estimates of the probable value of its reimbursable services.

At the direction of HHS, Blue Cross began making bi-weekly deductions of $11,800 in September, 1979 from current payments to Monsour in order to recoup alleged overpayments totaling $463,153 during fiscal years 1978 and 1979. Monsour appealed Blue Cross' overpayment determination to HHS' Provider Reimbursement Review Board (PRRB). The appeal is still pending; however, an appeal to the PRRB does not stay the recoupment of an alleged overpayment pursuant to 42 C.F.R. § 405.1803(b). Accordingly, by letter dated August 10, 1979 (Plaintiff's Exhibit # 207), Monsour expressly accepted Blue Cross' biweekly deduction of $11,800 from its interim Medicare payments.

On April 1, 1980, Blue Cross, at the direction of HHS, ceased withholding $11,800 from Monsour's biweekly interim payments. Of the $463,153, Blue Cross has currently recovered $281,758. At the direction of Monsour, Blue Cross has paid weekly since April, 1980 the sum of $11,800 to the Internal Revenue Service in accordance with the Order of Court dated March 5, 1980, to which the Internal Revenue Service and Monsour mutually consented.

### III. Discussion

■ Section 365 of the Bankruptcy Code grants a trustee [or debtor-in-possession pursuant to 11 U.S.C. § 1107(a)] the power to assume or reject any executory contract or unexpired lease of the debtor. The Code, like the former Bankruptcy Act, does not define the term "executory contract"; however, the legislative history of section 365 leaves no doubt that an executory contract is one "in which neither side has fully performed at the commencement of bankruptcy". Fogel, "Executory Contracts and Unexpired Leases in the Bankruptcy Code", 64 Minnesota Law Review 341, 344 (1980). The legislative history provides:

> Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

H.R.Rep.No.595, 95th Cong., 1st Sess. (1977) at 347, reprinted in (1978) U.S.Code Cong. & Ad.News 5787, 5963, 6303–04; S.Rep.No. 989, 95th Cong., 2d Sess. (1978) at 58, reprinted in (1978) U.S.Code Cong. & Ad. News 5787, 5844. This interpretation of the term "executory contract" is in accord with

the view adopted by commentary and case law discussing section 70(b) of the former Bankruptcy Act, the provision from which section 365 is derived, that an executory contract is one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, "Executory Contracts in Bankruptcy: Part 1", 57 Minn.L.Rev. 439, 460 (1973). *E. g., Chattanooga Mem. Park v. Still*, 574 F.2d 349, 352 (6th Cir.), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978).

■ Section 365 is a powerful, rehabilitative tool in the hands of a trustee, who may reject any executory contract which is onerous and unprofitable to the estate. In order to preserve the status quo while the trustee decides whether to assume or reject an executory contract, section 365 provides that an attempted termination of a contract because of bankruptcy in ineffective. 11 U.S.C. § 365(e). Notwithstanding, the remedial purposes of the section are limited and it is well settled that if a trustee (or debtor-in-possession) elects to assume an executory contract, the trustee must accept the contract's burdens as well as its benefits. *Atchison, Topeka & Santa Fe Ry. Co. v. Hurley*, 153 F. 503 (8th Cir. 1907), aff'd. 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909); *In re Italian Cook Oil Corp.*, 190 F.2d 994 (3d Cir. 1951). The trustee must accept the contract *cum onere* and perform in full as the debtor would have been bound to perform had bankruptcy not intervened. *Matter of Steelship Corp.*, 576 F.2d 128 (8th Cir. 1978).

As noted above, Monsour filed a document with the Court on September 26, 1980 entitled "Substituted Acceptance and Rejection of Certain Executory Contracts with Third-Party Reimbursers", wherein Monsour agreed to accept whatever contracts this Court finds to be executory as of February 22, 1980, the date Monsour filed for reorganization. In accordance with the Court's findings of fact, two (2) executory contracts existed between Monsour and its third-party reimbursers as of February 22, 1980, namely (1) the 1976 Agreement between Blue Cross and Monsour, as extended through fiscal year 1980 by mutual agreement for purposes of Blue Cross reimbursement; and (2) the 1966 Agreement between Monsour and HHS.

### A. The 1976 Agreement

■ The evidence overwhelmingly demonstrates that the 1976 Agreement never terminated on June 30, 1979 because Blue Cross and Monsour agreed to modify the termination provisions of the 1976 Agreement and to extend its terms through fiscal year 1980.

Monsour erroneously argues that it has entered into three (3) separate contracts with Blue Cross since July 1, 1973: the 1973 Contract, the 1976 Contract and the 1979 Contract. Monsour maintains that only the 1979 Contract was in force and executory as of February 22, 1980 because both the 1973 Contract and the 1976 Contract had terminated by substitution of a new contract or by its specific terms, at some time prior to Monsour's filing for reorganization on February 22, 1980. Monsour further argues that its duty to repay any overpayment, assuming only *arguendo* that one existed, was an executory burden under the 1976 Contract which was rejected by Monsour on September 29, 1980. Monsour contends that Blue Cross has violated the automatic stay provisions of section 362 of the Code, since any alleged indebtedness for fiscal years 1977 and 1978 is an antecedent debt pursuant to section 547(b)(2) of the Code. Finally, Monsour argues that Blue Cross is, therefore, in effect setting off debts allegedly owed by Monsour against amounts payable to Monsour by Blue Cross after the date of Monsour's filing for reorganization.

These contentions are unpersuasive. The clear intent of Monsour and Blue Cross was not to enter into a new contract in March, 1979, but rather to extend for one-year the 1976 Agreement and all of its practices, customs and usages for purposes of Blue Cross reimbursement.

It is hornbook law that a written agreement may be subsequently modified by mutual agreement and that this modification may be shown by conduct, or by writing or by words. *Consolidated Tile and Slate Company v. Fox*, 410 Pa. 336, 189 A.2d 228 (1963); *Wagner v. Graziano Construction Co.*, 390 Pa. 445, 136 A.2d 82 (1957); 2 Williston on Contracts § 623 (3d ed. 1959). In this situation, the parol evidence rule is inapplicable since it applies only to prior or contemporaneous statements or agreements. *Elliot-Lewis Corp. v. York-Shipley, Inc.*, 372 Pa. 346, 349, 94 A.2d 47, 49 (1953). In *Bartlett v. Stanchfield*, 148 Mass. 394, 395, 19 N.E. 549, 549 (1889), Mr. Justice Holmes stated:

> Attempts of parties to tie up by contract their freedom of dealing with each other are futile. The contract is a fact to be taken into account in interpreting the subsequent conduct of the plaintiff and the defendant, no doubt. But it cannot be assumed, as a matter of law, that the contract governed all that was done until it was renounced in so many words because the parties had a right to renounce it in any way and by any mode of expression they saw fit. They could substitute a new oral contract by conduct and intimation, as well as by express words.

Whether the subsequent conduct of the parties amounts to a modification of their contract, is a question to be decided by the trier of fact. *Dora v. Dora*, 392 Pa. 433, 141 A.2d 587 (1958).

In this case, the modification of the 1976 Agreement by Blue Cross and Monsour was established by both an oral agreement and a written agreement. Although the 1976 Agreement was originally intended by the parties to be effective only through fiscal year 1979, in March, 1979 Blue Cross and Monsour agreed orally and in writing to extend the 1976 Agreement through fiscal year 1980 for purposes of Blue Cross private reimbursement. They did not intend to enter into a new contract.

Monsour contends that the 1976 Agreement may not be modified so as to continue solely for Blue Cross private reimbursement purposes and that any extension must necessarily continue the contract as to all parties who signed the original agreement. Monsour therefore argues that an extension solely for purposes of Blue Cross private reimbursement is tantamount to entering into a new contract. Monsour fails to support this contention with any case law and the Court's research fails to disclose any such precedent.

The terms of the 1976 Agreement, as extended by mutual consent of the parties, included the right of Blue Cross to recoup its alleged overpayments by the method of cost rate adjustment for fiscal years 1978 and 1979. Blue Cross also had the right to make adjustments throughout the year in interim per diem payments and current financing payments so as to minimize a projected, final overpayment for fiscal year 1980. As of February 22, 1980, the date Monsour filed for reorganization, Blue Cross, therefore, had the right to make these deductions and adjustments.

On the other hand, Monsour had an ongoing, contractual right to invoke the dispute procedures of the 1976 Agreement, which, in turn, adopted the dispute procedures outlined in the 1973 Agreement. Moreover, the course of dealings between Monsour and Blue Cross supports the conclusion that it was the understanding of both parties that Blue Cross had the right to make such deductions and adjustments, and that Monsour had the right to invoke the contract's dispute procedure. In August, 1979, Monsour's administrator agreed to a deduction of $6,579.23 in the weekly interim payments. Monsour's attorneys also thought that there was a contractual duty to invoke the dispute procedure in order to contest the 1978 cost rate adjustment. (Plaintiff's Exhibit # 3).

Significantly, the automatic stay provision of section 362, 11 U.S.C. § 362, never operated to preclude Blue Cross and Monsour from performing their respective duties under the 1976 Agreement. Business continued as usual after February 22, 1980 and Blue Cross continued to pay large sums of money to Monsour pursuant to the terms of

the 1976 Agreement. Any deductions or adjustments made by Blue Cross subsequent to Monsour's filing for reorganization on February 22, 1980, were a part of the performance of the 1976 Agreement and did not violate the automatic stay, 11 U.S.C. § 362. Congress clearly did not intend that a debtor-in-possession hide under the automatic stay and demand all of the benefits of an executory contract, while performing none of its burdens, during the period from the date of filing and the date that the debtor-in-possession elects to accept the executory contract under section 365 of the Code. Monsour must accept the contract *cum onere* and perform under the 1976 Agreement as if bankruptcy had not intervened, *Matter of Steelship Corp.*, 576 F.2d at 128. Monsour must, therefore, accept Blue Cross' deductions in its weekly interim payments and the adjustments of its per diem rate and current financing payments. Monsour may, of course, invoke the dispute procedures outlined in the 1973 Agreement, which procedures were incorporated into the 1976 Agreement.

### B. The 1966 Agreement

The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, contains two (2) substantively distinct parts: Part A, 42 U.S.C. §§ 1395c–1395i–2, provides insurance for hospital and related post-hospital services; and Part B, 42 U.S.C. §§ 1395j–1395w, provides insurance for supplementary medical services.

Only those hospitals that qualify as "providers of services" under § 1395x(u), which in turn incorporate § 1395e, j, and o, and that are accredited under § 1395bb, are eligible to participate in the Medicare Program. Pursuant to this requirement, on May 25, 1966, Monsour entered into the 1966 Agreement with HHS, wherein Monsour agreed to become a "provider of services". Despite Monsour's contention that the 1966 Agreement merely evidences Monsour's eligibility to participate in the Medicare Program as a health care provider, the Court finds that the parties clearly intended at that time to enter into an ongo-

ing, contractual relationship governed by the Medicare Program and the regulations promulgated thereunder. Moreover, the conduct of the parties subsequent to their entering into the 1966 Agreement supports this finding. From 1966 until the present, Monsour has provided services to Medicare patients and Blue Cross, the fiscal intermediary, has reimbursed Monsour in accordance with the Medicare Program and its regulations.

The Medicare Program is structured around the concept of reasonable cost. Section 1395f(b) provides that the total amount to be paid to a provider shall be "the reasonable cost" of services rendered to Medicare beneficiaries, as determined under Section x(v). Section x(v) accords HHS broad authority to establish regulations governing the precise method of cost calculation. Section 1395d defines the benefits covered by Medicare and section 1395y defines exclusions from the general scope of benefits outlined in section 1395d.

Final determination of the reimbursable "reasonable costs" can only be determined at the end of the fiscal year after audit by HHS. Accordingly, in order to provide the hospital with working capital throughout the year, Congress has mandated under section 1395g that HHS reimburse the provider, at least monthly, an interim payment of its estimated expenses, based upon billings submitted by the provider to its fiscal intermediary. 42 C.F.R. § 405.250, 405.454. Section 1395g provides that HHS may make corrective adjustments to current interim payments in order to recoup overpayments or underpayments from a prior fiscal year. 42 C.F.R. § 405.454(f) and § 405.1803(b). Case law has upheld the right of HHS to off-set current obligations in order to recoup alleged overpayments. *E. g. Wilson Clinic & Hospital, Inc. v. Blue Cross*, 494 F.2d 50 (4th Cir. 1974). Moreover, if the provider disagrees with the overpayment determination, the provider may invoke the administrative remedies set out in the Medicare Program and its implementing regulations. Section 1395oo(a)–(e); 42 C.F.R. § 405.1835. These administrative remedies fully comport with the require-

ment of due process. *Russi v. Weinberger*, 373 F.Supp. 1349 (E.D.Va.1974).

■ The 1966 Agreement between Monsour and HHS was an executory contract as of February 22, 1980. Any deductions or adjustments made by HHS after February 22, 1980 were in accordance with the 1966 Agreement and did not violate the automatic stay provision of the Bankruptcy Code, 11 U.S.C. § 362. Monsour simply may not receive, under the guise of the Bankruptcy Code, all of the benefits of the 1966 Agreement without assuming its concomitant burdens. The debtor-in-possession has made the business judgment to accept its contract with HHS and must perform in full as if bankruptcy had not intervened. *In re Italian Cook Oil Corp.*, 190 F.2d at 997.

### IV. Conclusion

The Court hereby approves Monsour Medical Center's acceptance of the following two (2) executory contracts: (1) the 1976 Agreement between Blue Cross and Monsour, as extended through fiscal year 1980 by mutual agreement for purposes of Blue Cross reimbursement; and (2) the 1966 Agreement between Monsour and HHS.

Blue Cross did not violate section 362 of the Bankruptcy Code, but had the ongoing, contractual right to make all of the deductions and adjustments in its payments to Monsour that the Court herein found. Similarly, any deductions or adjustments made by HHS subsequent to Monsour's filing for reorganization were a part of the performance of the 1966 Agreement, an executory contract within the purview of section 365 of the Code.

Accordingly, the first count of Monsour's counterclaim against Blue Cross and Monsour's third-party complaint against HHS are dismissed with prejudice. Judgment will be entered in favor of HHS and Blue Cross.